Madden, Judge,
delivered the opinion of the court:
The plaintiff sues for just compensation for the taking by the Army of the United States of her real and personal property.
The plaintiff was a resident of Austria until 1935, in which year she became a resident of the United States. She became a citizen of the United States in 1944. Beginning in 1921, she began to come to the United States each year to sing at the Metropolitan Opera in New York, where she was a star of the first magnitude. At some time before 1929 she acquired three properties at Unterach am Attersee in Austria. The property with which this case is directly concerned is a castle-like villa located on a lake and surrounded by mountains and forests. It is property No. 100. Property No. 99 is across the road from No. 100, and is a guest house accessory to No. 100. Property No. 125 is, like No. 100, a lake front villa some ten minutes walk from Nos 100. A large addition to No. 100 was completed in 1930, as was the extensive remodeling of the old part of the house. The two villas were used only in the summer months, No. 100 and its guest house by the plaintiff, and No. 125 'by her two sisters, Mrs. Wachtl and Mrs. Krones, residents of the Sudetenland in Czechoslovakia, and their families.
In 1935, upon removing her residence to the United States, the plaintiff gave up a large apartment which she had occupied for some years in Vienna. She caused the furnishings of the apartment to be packed for shipment and had some of them shipped to the United States. The greater part were, however, shipped to Unterach, to be placed in house No. 100. The plaintiff then went to Unterach and made an inventory of the contents of house No. 100, including, however, only those things which had- already arrived there out of the Vienna apartment. Many of the things sent from Vienna had not yet arrived at Unterach.
Among the boxed things that had arrived when the plaintiff was at Unterach was a trunk full of silver. It contained numerous sets of sterling table silver. The trunk was placed in house No. 100. The plaintiff had the trunk opened and the trunk and its contents moved across the road to house No. *236 99 and placed in the room of the plaintiff’s caretaker, Mr. Speigner. The trunk was repacked and locked. Perhaps two other boxes or trunks of silver were placed in the same room.
After about two weeks at Unterach, the plaintiff caused house No. 100 to be locked up, gave the keys to the caretaker, returned to Vienna and a few days later started for the United States. From that time in 1935 the plaintiff never returned to Unterach, or to Austria, until 1948.
So far as appears, the caretaker faithfully cared for the property. The gardens, which had been beautifully planted, mostly with roses, when the plaintiff was using the property, may have been maintained during the earlier years. There is some evidence, by no means conclusive, that in 1941 a unit of the German Army occupied the property. If this occurred, the house and its contents were not visibly disturbed, since witnesses for the defendant testified that they saw things in apparent good order inside the house as late as 1943.
In 1944 the Nazi authorities took possession of house No. 100, first as a nurses’ training school and shortly after that as a hospital for unmarried mothers. Prior to this occupancy, Mrs. Wachtl, the plaintiff’s sister, caused the furniture from many rooms of No. 100 to be removedlo No. 99 and stored in one or two rooms there.
In 1941, when the United States and Germany each sent home the consular officials of the other, Dr. Gyssling, the German consul at Los Angeles, who was a friend of the plaintiff, secured her permission for his daughter, Angelica, and his housekeeper to live in No. 99 at Unterach. The housekeeper, Mrs. Boone, was an American citizen of German birth. She and Gyssling’s daughter went to Unterach. Later No. 99 was taken by the German authorities as a shelter for refugees, and Mrs. Boone and Angelica lived in No. 125, the Wachtl villa.
About June 1,1945, the Wachtl family, who were refugees from the Czechs, succeeded in getting to Unterach. There was a quarrel between them and Mrs. Boone about the right to occupy No. 125, a number of Mrs. Boone’s relatives and other persons who had fled from Vienna having taken residence there with her. The German authorities required Mrs. *237 Boone to move out and the woman in charge of the hospital in No. 100 allowed her and her sister-in-law and Angelica to sleep on the floor in that house.
About the middle of June 1945, Captain Clayton, whose duty it was to locate sites for rest centers for enlisted men and officers of the 65th Division, United States Army, came to Unterach. He was referred by German officials to Mrs. Boone as a possible interpreter. When he went to find Mrs. Boone, he discovered house No. 100 as a desirable rest home for officers. He recommended it to his superiors and it was taken for that purpose. The hospital moved out a few days later. The house was renovated, necessary repairs were made by labor furnished by the Burgomeister, the furniture which had been stored in No. 99 was replaced in No. 100. Mrs. Boone was employed as housekeeper and supervisor; she hired the necessary servants; Captain Clayton and a sergeant resided in the house.
The Army remained in possession until June 30, 1947. Until the spring of 1947, the house was used as a rest center for officers up to and including the rank of captain. They came in groups of from 10 to 20 at a time, and stayed for about a week. Every other night there was entertainment by musicians and other entertainers obtained from the area. There were dances, and there was drinking to the extent that might have been expected. There was fishing; boating, swimming, horseshoe pitching, ping-pong and attempts at baseball. During the last few months of the American occupancy, the house was used primarily as a rest center for staff officers of the rank of colonel and above. Only about fifteen such officers used the rest home. One or two of them at a time, with their wives and children and members of their staffs, would come for a week-end.
ín January 1946, the American Military Government for Austria appointed an Austrian bank as the administrator of house No. 100 and its contents. On July 11, 1947, after the Army had ceased to use the property, it released it to the custody of the bank. As we have seen, the plaintiff returned to her property in August 1948, released the publicly appointed administrator and made her own arrangements for the future care of her property.
*238 The plaintiff claims that large numbers of highly valuable items in the line of silver, chinaware, crystal, pictures, rugs, linens, tapestry and furniture were destroyed or stolen during the American occupancy of the house. ' That occupancy covered only two of the thirteen years that the plaintiff was out of touch with her property.
The plaintiff has fairly well persuaded us that most of the things for which she sues were on the property in 1935, and had disappeared by 1948. That, of course, is only a short step in the direction of persuading us that the things were stiff there in 1945 and had disappeared by 1947'.
Most of the missing valuables were relatively small objects, dishes, silver, porcelain decorative pieces, pictures, rugs, etc. They could have been carried off very easily by anyone who had access to them. Probably many of them would, if they had been there, have been carried off by the perhaps thousand or more young officers who made use of the rest home. We think, however, that not many of these objects were in house No. 100 when the Army took possession of it.
When Captain Clayton set about to make the house ready for visitors, he sent for dishes from a nearby factory or army supply depot. He would not have done so if the closets had been stacked with sets of dishes such as the plaintiff claims to have lost. The same is true of the bed sheets, table linen, blankets, etc. Several inventories were made of the contents of the house. They were made by different persons; they described room and objects by different designations; they are hard to reconcile with one another; but none of them come near to including all of the types of things, or the numbers of the things, which are claimed by the plaintiff. Some of the closets may have been locked, at some of the periods of time, but some of the china and glassware closets had glass doors, and their contents would have been visible. 4
The plaintiff urges that since the Army, upon taking possession of the property, did not make an official inventory, and give the plaintiff a receipt for the property taken, it is in no position to contest the plaintiff’s claim that what was there in 1935 was there and was taken in 1945. The Army’s failure to do, or to cause the German authorities to do, what international law wisely requires when property is taken, *239 does make its position somewhat more vulnerable. But when, as in this case, there is evidence of the happening of events which disturbed the 1935 status of the property, and evidence, which we believe, of the fact that the most of the property in question was not present in 1945, and hence was not taken, there would be no justification for penalizing the Government for not making an inventory and giving a receipt, by making it pay for property which we think it did not get.
We have referred to the trunk of silver which the plaintiff, in 1935, placed in the room and the custody of her caretaker. In 1945, Captain Clayton, having obtained some army tableware which was not up to the standard of an officers’ rest home, learned about the plaintiff’s silver. With a good deal of formality and over protests of the plaintiff’s caretaker and her sister, the needed pieces of silver were carefully counted out and receipted for. The receipt given indicates that three days later some additional pieces were taken and receipted for. There is no oral testimony as to the circumstances of this second taking. The plaintiff says that that left in the caretaker’s room in house No. 99, nine-tenths of the contents of the trunk that was opened, and two other unopened trunks or boxes of silver. All of that silver is alleged to have disappeared, except possibly a few casual items such as trays, and the plaintiff says that the Government should pay for all of it. But there is no evidence that the Army ever had it. Both the plaintiff’s caretaker and her sister, though they died before the trial in this case, were alive when the plaintiff returned to her house in 1948 and investigated the disappearance of her belongings. The silver could not possibly have disappeared from the caretaker’s room in house No. 99 which was never occupied by the Army, without their knowing what became of it. Yet no evidence is offered, even in the nature of hearsay, on the subject.
A large amount of the plaintiff’s silver was used at the wedding supper when the plaintiff’s niece was married at Unterach in 1946. The trial commissioner of this court made the following finding:
* * * Plaintiff has acknowledged that the silver used at the wedding was recovered in 1948, * * *.
*240 The plaintiff took no exception to this finding. She asked only that the following finding be made:
This silver was given to Cinda Wachtl and her mother by an American Officer, and a receipt was given to the Officer.
Cinda Wachtl testified not only that it was given to her by an American officer at house No. 100, but that it was returned to the officer after the wedding, all in 194&. Yet the plaintiff recovered it in 1948, a year after the Americans had left the scene. If we were frankly told from whom and under what circumstances the wedding silver was retrieved, it might throw much light upon the problem of the disappearance of much of the plaintiff’s property.
The plaintiff takes the position that the Army, having caused the trunk to be opened, and having taken and receipted for some of the silver, became responsible for all the silver, no matter who stole it. That is of course not the law. The Army never took possession of any of the silver in the trunk or in the room except what it receipted for. The rest of it remained in the possession of the plaintiff, in her house and in the care of her designated custodian.
On the whole case, a study of the evidence gives no answer to the question of what became of the plaintiff’s possessions. We have the impression that a relatively small fraction of them came into the possession of the Army. Even that small fraction, however, would have had a considerable value, since the plaintiff’s things were luxurious and expensive. There were accurate inventories made at the beginning and the end of the second year of the Army’s occupancy, and those inventories showed a considerable loss by breakage or disappearance of objects. The first year of occupancy would have involved much more use of the plaintiff’s things, with proportionately more breakage and disappearance. The house no doubt had hard usage during the occupancy.
We think a considerable amount of the plaintiff’s personal property was lost or destroyed while in the Army’s possession, and that considerable damage was done to her house. Without any pretense of accuracy, and treating the question as a jury would have to treat it, we conclude that the plaintiff may recover eleven thousand dollars.
*241 The Government raises anew tibe questions which we considered and decided when we denied its motion for a summary judgment. Seery v. United States, 130 C. Cls. 481. We adhere to the views expressed in that opinion.
The plaintiff is entitled to recover eleven thousand dollars, which amount includes any interest which might be payable as a part of just compensation, and judgment will be entered to that effect.
It is so ordered.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff is a citizen of the United States, was naturalized in 1944, and has resided in the United States since 1935. She was born in Austria but came to the United States in 1921 and annually thereafter until 1932 to sing at the Metropolitan Opera in New York. Plaintiff married Baron Leopold Podraghy in 1919; that marriage was dissolved in 1934. In 1935 she married Winfield Sheehan, an American citizen who was president of Twentieth Century Fox-Film Corporation. After Mr. Sheehan’s death in 1945, plaintiff married her present husband, Irving P. Seery, who is an American citizen. Plaintiff is a loyal American citizen.
2. Plaintiff owns certain real property and the houses thereon in Austria at Unterach am Attersee. The properties are designated as premises nos. 99, 100, and 125. No. 125 is located at some distance from the other two properties and is not directly involved in this action. Plaintiff has been the owner of record of the three properties since their acquisition prior to 1929.
Plaintiff did not rent her properties and they have never been used by her for commercial purposes.
3. The property known as no. 100, or the Haus am See, is a castle-like house which is beautifully located on a lake and surrounded by mountains and forests. It contains from *242 20 to 24 rooms, including three or four bathrooms. At all times pertinent to this suit, there were also located on the property a boathouse, a garage, a bathhouse, and a small garden house enclosed on three sides. The house had electricity, central heating, and modern plumbing.
No. 99, known as the Stoecld, is a guesthouse containing nine rooms and is located across the street from the Haus am See.
Property no. 125, known as the Wachtl Villa, is located at some distance from the other two houses. It consists of nine rooms and was occupied during the summer months by plaintiff’s sisters, Risa Wachtl and Susie Krones, and members of their families. Risa Wachtl died in 1954.
4. The Haus am See consists of a new main house and an old house. The new house and the remodeling of the old wing were completed in 1930.
In 1931, plaintiff employed a landscape architect to landscape property no. 100 and, under his direction, 250 rosebushes, 20 conifers, and hundreds of flowers were planted on the premises. There were also two palm trees which were set in boxes so that the palms could be brought into shelter in the winter.
5. For two or three months during each summer from 1930 to 1935, plaintiff occupied the Haus am See. It was luxuriously furnished with antique-style furniture, oriental rugs, figurines and other objects of art, pictures, paintings, silver, chinaware, crystal, and a considerable quantity of fine linen. Although most of the furnishings consisted of reproductions, there were a number of antique pieces.
While she resided at the Haus am See during the summers, plaintiff frequently entertained royalty, prominent persons, and close friends as her guests. Her dining room could seat 24 people, and buffet suppers for as many as 100 guests were served on the terrace from time to time. An annual party was also given for about 200 children from the village and the town officials who accompanied them.
6. Until September 1935, plaintiff maintained an apartment consisting of 12 rooms in Vienna, Austria. It wa3 furnished in the same manner as the Haus am See.
*243 7. Sometime in September 1935, plaintiff closed her apartment in Vienna and shipped part of her personal property contained therein to the United States and the remainder to Unterach. She and her secretary then spent about two weeks at Unterach, returned to Vienna, where they resided in a hotel for a short time, and left for the United States in-October 1935.
No inventory was made of the goods shipped to the United States. The invoices plaintiff paid to a moving and storage company at the time show that on September 24,1935, three vans of furniture were transported from Vienna to Unterach, and that on the next day one van of furniture was moved from plaintiff’s apartment to a warehouse. Between September 26 and September 30 of the same year, the mover picked up at the Hotel Bristol, where plaintiff stayed temporarily, eight boxes, three packages, and four suitcases. No rugs or silver were shipped to the United States. Among the goods shipped to the United States were a piano, a dining room set, a bedroom set, about ten figurines, and a few personal articles which were not described.
8. During the two weeks she spent at Unterach in September 1935, plaintiff and her secretary made an inventory in the German language of her personal property in house 100. The inventory included a portion of the goods that had arrived from Vienna before plaintiff’s departure from Un-terach, but the evidence does not show how much of the shipment from Vienna was on hand at the time the inventory was made. One of the invoices in evidence is a charge for moving one van of furniture from Vienna to Unterach in July 1936, after plaintiff had returned to the United States.
Included in the shipment that arrived from Vienna before the inventory was taken was one trunk containing silverware. Plaintiff also packed the silverware which had been in use in the Haus am See, in two other trunks, and all three trunks of silver were then stored in the bedroom of the caretaker in the guesthouse. The remainder of plaintiff’s personal property was left in the Haus am See.
The inventory made by plaintiff and her secretary consisted of 20 or 25 pages in two copies. One copy was left in plaintiff’s boudoir in the Haus am See, and she took the other *244 with, bar to the United States. The 1985 inventory was not a detailed and complete description of plaintiff’s property in such terms as"appear in the amended schedule to plaintiff’s petition. The inventory was made for plaintiff’s purposes and did not list the dimensions of the furniture, the sources from which the various articles were obtained, the purchase prices, or values thereof.
Neither the original nor the copy of the 1935 inventory was offered in evidence. Plaintiff did not have copies of the inventory made in 1948 when she used it to prepare a claim against the defendant. On November 30,1948, while she was residing in the United States, plaintiff’s automobile was broken into and a brief case containing a copy of the inventory and other valuable papers was stolen. A report was made to the police about the robbery, and the incident was described in a newspaper story on December 1,1948.
9. When plaintiff left Unterach in 1935, the house was closed and locked. It was equipped with heavy exterior doors, and the windows were protected by steel shutters and wrought-iron grills.
Plaintiff left the keys to the Plans am See with Hans Speigner, her caretaker, who occupied rooms in the guesthouse. To assist the caretaker, plaintiff also employed a housekeeper, who was given a key to the main entrance of the Haus am See, and who slept in a room on the first floor.
Plaintiff had planned to return the following summer, but she stayed in the United States until August 1948, when she returned to Unterach.
10. Plaintiff’s sisters lived in Bruenn, Czechoslovakia, but they and members of their families occupied the Wachtl Villa in Unterach in the summer months from 1935 to 1945, when they moved permanently into the villa. However, from some time in 1944 until June 1, 1945, Mrs. Boone, named hereinafter, and her family and friends occupied the Wachtl villa. At the end of each summer when the plaintiff’s sisters returned to Czechoslovakia, they locked the villa and left the keys with Speigner, the caretaker.
11. On September 23, 1935, before she left Unterach, plaintiff contracted with a local architect and builder to erect an addition to the Haus am See in the form of a tower. *245 It consisted of a bar downstairs with a bedroom, bathroom, and closet above. This addition to the property was completed on or about July 1936.
12. It may be that at some time in 1941, a unit of the German Army occupied some or all of the Haus am See. If this occurred, it seems not to have disturbed or damaged the house or its contents and furnishings.
13. During 1936 in Los Angeles, plaintiff became acquainted with Dr. Georg Gyssling, German Consul in Los Angeles, his thirteen-year-old daughter, Angelica, and Mrs. Christine Boone, who served as Dr. Gyssling’s housekeeper and as nurse for his daughter.
When Dr. Gyssling returned to Berlin in July 1941, during the exchange of consuls, his daughter and Mrs. Boone traveled with him. Before their departure they informed plaintiff that Dr. Gyssling had no home in Germany, and plaintiff granted them permission to occupy rooms in the guesthouse at Unterach. At the same time, plaintiff wrote a letter to her sister, Bisa Wachtl, informing her of the prospective arrival of Dr. Gyssling, Angelica, and Mrs. Boone, and stating that they were to have the use of rooms in the guesthouse (property no. 99). Mrs. Boone was an American citizen. However, she made this trip to Germany on a German diplomatic passport.
After their arrival in Europe, Dr. Gyssling remained in Berlin, but Mrs. Boone and Angelica proceeded to Unterach and moved into rooms in the guesthouse about August 1, 1941. At that time, the Haus am See was not occupied.
Neither Mrs. Boone nor Dr. Gyssling was given authority to act as plaintiff’s agent or in her behalf while in Unterach, nor were they authorized to reside in any of her properties except the rooms in the guesthouse. In December 1941, a problem arose regarding the payment of the local taxes due on plaintiff’s property, since it was no longer possible for plaintiff to transmit funds to Austria. On December 20, 1941, Dr. Gyssling addressed a letter to the District Court of Upper Austria, stating that plaintiff had requested him to raise funds for the payment of the taxes but that, since she was a foreigner, money could not be loaned in her behalf without special permission. Therefore, he suggested that *246 Dr. Leo Wachtl, plaintiff’s nephew, be appointed guardian of the property in order that he might obtain the funds needed for the payment of the taxes by mortgaging the property. Thereafter, on January 27,1942, the court issued a decree appointing Dr. Wachtl as guardian of plaintiff’s three properties in Unterach.
14. In the summer of 1942, Dr. Gyssling, his daughter, and Mrs. Boone moved into the old wing of the Haus am See. Dr. Gyssling had learned that the German Gauleiter in Linz was about to seize the property. Also, at that time there was a great influx of war refugees from eastern Europe into Unterach, and many of them were billeted in private homes by orders of the municipal authorities. By moving into the house, Dr. Gyssling hoped to forestall its occupancy by soldiers or refugees. Plaintiff’s sister, Mrs. Eisa Wachtl, gave Mrs. Boone the keys to the old wing, but the new wing remained locked with the keys in the possession of Mrs. Wachtl.
Dr. Gyssling stayed in Unterach for only two or three months at a time. However, Mrs. Boone and Gyssling’s daughter resided in the old wing of the main house from the summer of 1942 until sometime in 1944. During Mrs. Boone’s residence there, her mother, her brother, and her sister-in-law also lived or stayed in the old wing of the house for varying periods of time.
15. During the summers of 1942 and 1943, while plaintiff’s sisters were residing in Unterach, they frequently entered the Haus am See with plaintiff’s caretaker and had him, remove boxes and crates, containing personal property belonging to plaintiff, to the Wachtl Villa. The record does not show what articles were contained in the boxes and crates.
16. On March 18, 1943, an administrator for plaintiff’s properties in Unterach was appointed by the German Alien Property Custodian. In 1944 the new wing of the Haus am See was requisitioned by the Germans and used as a nurses’ training school.
17. After a short period of use as a nurses’ training school, the Nazis occupied and used the new wing of the Haus am See as a maternity home for unmarried mothers. With an increase in the number of patients, the maternity home took *247 over the old wing of the house in the spring of 1945, and thereafter occupied the entire house until about July 1,1945. Hospital beds and hospital equipment were moved into the house, and at least one of the rooms was converted into an operating room in order to provide complete hospital facilities for the care of the mothers and children.
18. On May 10,1944, while Mrs. Boone and Angelica lived in the old wing of the Haus am See, the German Office of Public Welfare at Linz caused an inventory to be taken of the personal property located in the old wing. The inventory was signed for the owner by Mrs. Wachtl, and for the Office of Public Welfare by one Schroeder, as well as by Mrs. Boone.
On May 15,1944, the German Office of Public Welfare at Linz also caused an inventory to be taken of the personal property located in the new wing of the house, and this inventory was signed for the owner by Mrs. Wachtl and for the Office of Public Welfare by Schroeder.
The Office of Public Welfare had also, on May 6, 1944, taken an inventory of the contents of the Wachtl Villa, but there is no proof as to whether an inventory was made at that time of the contents of the guesthouse (property 99).
19. Although the record is not entirely clear on this point, the evidence leads to the conclusion that two inventories covering the contents of the Haus am See in May of 1944 (hereinafter referred to as the May 1944 inventories) were taken just prior to the occupancy of the new wing by the nurses’ training school and the maternity hospital. In the two inventories, the several items listed are described in general terms sufficient to identify each item by its nature and type but not sufficient to distinguish any article from others of the same kind. The inventories listed the contents of the house room by room, and no specific reference was made therein to the presence of the various dinner sets, china, crystal, and fine linen which were left in the house when plaintiff departed from Unterach in 1935. Plowever, the references to closets with various glasses and porcelain and silver items indicated the presence of some such things, without any indication of the number of them.
In the May 1944 inventory covering the new wing, the following articles were listed at the locations shown:

*248
Staircase Landing

5 Wood boxes, nailed shut.
1Wood box, nailed shut.
1Large trunk, locked.
10 Pictures
1 Chest of drawers, locked, (marked “belongs to Mrs. Wachtl”)
1 Box, full, closed.
1 Large trunk.

Hallway

8 Suitcases, locked.

Hallway Behind Kitchen

2 Wood boxes, full, nailed.
3 Silver trays.
2 Silver vases with blue glass.
3 Upholstered chairs.
1 Three-section closet with various glasses and porcelain items.
1 Closet with various glasses and silver items.

Hall

(In addition to other items, the listing includes the following:)
5 Pictures.
22 Slipcovers for furniture.
5 Various mirrors
56 Pictures
2 Wardrobes, locked, (marked “Mrs. Wachtl”)
10 Various paintings
20. Sometime during 1944, Mrs. Wachtl moved some of plaintiff’s fumishings from the Haus am See and stored them in one or two locked rooms in the guesthouse. A comparison of the May 1944 inventories with an inventory taken in June 1945, leads to the conclusion that this furniture was stored in the guesthouse after the 1944 inventories were taken but before the nurses’ training school and the maternity hospital occupied the new wing of house 100. There was no inventory of the furnishings moved to the guesthouse, and the identity of the rooms on the second floor of house 100 from which furniture was removed cannot be determined from the evidence. However, the following described furnishings were contained in the downstairs rooms of house 100 on May 15, 1944, and such furniture was not in the three rooms in June 1945:

*249
Blue Drawing Boom

1 White leather Chaise lounge
2 Carpets
1 Bedside carpet
8 Coco carpets
4 Coco rugs
6 Various small tables
3 Bedside tables
2 Flower stands
2 Flower stools
1 Sofa
1Heavy table
1 Candelabra
8 Upholstered chairs
1 Upholstered stool
1 Bound table
1 High record-player
1 Three-fold wardrobe, with various china and glass decorations
3Upholstered chairs
1 Chair
3 Sofas
3 Bed sets
4 Various mirrors

Area between the Ball and the Blue Drawing Boom (Dining Boom)

1 Large round table
1 Bound table
20 Upholstered chairs
4 Iron chairs
2 Bound tables
2 Upholstered chairs
1 Upholstered chair
1 Couch
1 Large painting
1 Painting
1 Chaise lounge
5 Flower stools
1 Large record-player
1 Small cabinet
1 Desk
1 Candelabra

Bar

1 Desk
1 Small table
1 Music stand
1 Small cabinet
1 Small, oval, basket table
5 Chairs
1 Upholstered chair
1 Long cane chair
1 Long cane chair, with cus
11 Cane chairs, upholstered
1 Heavy chair, upholstered
1 Upholstered chair
3 Upholstered stools
2 Large mattresses
2 Mattresses (3 parts each)
3 Mattresses
5Window cushions
21. In the spring of 1945, the officials of the maternity home demanded that Mrs. Boone and Angelica vacate the old wing in order that the hospital could use the entire house. They moved from the house and the municipal authorities assigned them living quarters in the Wachtl Villa in 1944 or 1945. They were not able to obtain rooms in the guesthouse, because all of its rooms, except the caretaker’s quarters and the room or rooms in which plaintiff’s furniture was stored, were occupied by war refugees.
22. American Forces, consisting of a troop of mechanized cavalry, first reached Unterach about May 12,1945, and were *250 quartered in one of the inns there for a period of about one month. The troops did not occupy or use any of plaintiff’s three properties. Mrs. Boone informed the commanding officer that the Haus am See belonged to plaintiff, an American citizen, and requested that the house-be placed under United States custody. The officer referred her to another Army official in Linz, Austria, to whom she repeated her request in the latter part of May or early June 1945.
23. On June 1, 1945, the Wachtls returned to Unterach, and took possession of the Wachtl villa. The villa was then occupied by Mrs. Boone and her relatives and friends. There was a controversy between Mrs. Boone and the Wachtls as to the occupation of the villa. The Wachtls had come from a refugee camp where they had been mistreated by the Czechs, in retaliation for the mistreatment of Czechs by the Germans. The Burgomeister ordered the Boone party out of the villa. The nurse in the maternity home assigned sleeping space to Mrs. Boone, her sister-in-law, and Angelica Gyssling in the dining room of the Haus am See. All the other rooms were occupied by patients and personnel of the maternity hospital.
24. About the middle of June 1945, Captain Prentiss Clayton, a Special Service Officer of the 65th Division, United States Army, who was attempting to locate sites for rest centers for enlisted men and officers of the division, came to Unterach. He was unable to speak German and was referred to Mrs. Boone as a possible interpreter. When he- called on her, he inspected the Haus am See, and reported to his superior that it was large enough to meet the division’s requirements as a rest center for officers. Three or four days later, he returned to inquire from the German doctor in charge of the maternity hospital when the hospital could vacate the house and ascertained that the house would be available in a few days. When this fact was communicated to his superior, the Army decided to use the house as a rest center for officers. At that time, the Army did not have a property control or real estate office in that area of Austria, and no requisition forms were available. The situation with respect to the organization of the 65th Division was about the same as had prevailed during combat. The Army *251 took possession of property 100 as soon as the maternity hospital moved out. The exact date when this occurred is not established by the record, but it was about July 1,1945. The Army employed Mrs. Boone as housekeeper for the rest home.
25. About the time the Army decided to use the Haus am See as an officers’ rest center but prior to the removal of the German maternity hospital, Mrs. Boone and her sister-in-law made an inventory of the contents of the Haus am See, the guesthouse, and the Wachtl Villa. These inventories listed the property by the rooms in which it was located in the same maimer as had been done in the May 1944 inventories. The May 1944 inventories of the contents of the Haus am See were used as a basis for making the 1945 inventory, the earlier inventories being checked against the actual contents of the house to determine what was present and what was missing. Pencil marks were made on the 1944 inventories to show whether particular articles were still on hand or were missing, but the evidence regarding these pencil notations is so vague and ambiguous that no accurate determination can be made as to what articles had disappeared between May 1944 and the latter part of June 1945.
The 1945 inventory did not list the contents of the drawing room, dining room, and bar, which were then in use by the maternity home. However, the inventory contained a notation to the effect that the furniture that had been in these rooms was stored in the guesthouse. The 1945 inventory likewise did not include the contents of five rooms on the second floor, which rooms were still being occupied by the maternity hospital at the time the inventory was taken. With respect to the five rooms, the inventory stated that the furniture that had formerly been in these rooms was stored in the guesthouse and in the bathhouse.
26. No reference was made in the 1945 inventory to the locked trunks, locked chest of drawers, wooden boxes (nailed shut), and the other articles which are described in finding 19 above. There is no proof as to what happened to such property between the time the 1944 inventories were taken and the date on which the 1945 inventory was made.
*252 27. After the German maternity hospital vacated the Haus am See, Captain Clayton moved into the house and employed Mrs. Boone as housekeeper and general supervisor during the period of the American occupancy. Since a number of the rooms were unfurnished, Captain Clayton directed Mrs. Boone to secure the assistance of the mayor of the town in obtaining furniture for these rooms. Thereupon, Mrs. Boone obtained from Mrs. Wachtl the keys to the room or rooms in the guesthouse, filled completely with the plaintiff’s furnishings that Mrs. Wachtl had previously removed from house 100 and stored in the locked room. Under Mrs. Boone’s direction, the furniture and furnishings were moved back into house 100.
Although the testimony of defendant’s witnesses who prepared the 1945 inventory (defendant’s exhibit 47) is to the effect that the inventory was made after the furniture had been removed from the room in the guesthouse, the inventory itself and other documentary evidence are in conflict with this testimony. From the record as a whole, it is concluded that the furniture was removed from the room in the guesthouse after the 1945 inventory was made, and that no separate inventory was made at that time of the furniture moved from the guesthouse to house 100 and used during the period of occupancy. The furniture taken from the guesthouse at that time did not include any silver, china, or glassware. However, four or five boxes containing china, glassware, linen, and kitchen utensils belonging to plaintiff were found in the attic, and the contents of the boxes were used during the period the house was operated as an officers’ rest home.
28. Captain Clayton learned that an American general expected to arrive at the Haus am See on July 17,1945. In preparation for his coming and in order to make the house habitable as a rest center, the Army employed local workmen to make a number of repairs to property 100.
The kitchen, staircase, and a number of other rooms inside the house were painted. The terrace was whitewashed. One stove was mended and the other stoves were cleaned out and put in order. The heating plant was worked on in order to provide a supply of hot water. The floors were cleaned, *253 scraped, and painted. During the time the maternity hospital used the property, some electrical wiring had been installed on the outside surface of the walls, and this was placed inside the house.
A number of rotten floorboards in the boathouse were replaced, and the boathouse was painted. A broken railing in the bathhouse was replaced and a window was reglazed. The bathhouse was cleaned. The swimming pier, which had rotted out through long exposure to water, was completely rebuilt, and a diving tower was installed on it. The diving tower but not the pier was later removed by the Army.
The flower garden which plaintiff had had planted in the area between the house and the lake in 1931 had either been largely removed or died through lack of care during the period of occupancy prior to the coming of the Americans. While the maternity hospital was in possession of the premises, part of the garden had been used for raising vegetables, and the remnants of the vegetable patch existed when the Army took possession of the premises. All of the rosebushes and other flowers, the palm trees, and all the remaining plants with the exception of a few large trees and some shrubs had disappeared. The vegetable patch was removed by the Army, the walkways were graveled, and some effort was made to keep the remaining shrubs, trees, and grass alive.
29. The quantity of plaintiff’s china and glassware found in the attic was not sufficient for the needs of the rest home, and most of the china and glassware used in the rest home was obtained from an Austrian manufacturing plant.
30. The silver tableware which was used when the Army first occupied the Haus am See consisted of a small quantity of silver which was loaned for that purpose by Mrs. Boone. It was not adequate to meet the needs of the rest center. Captain Clayton learned from Mrs. Boone that some of plaintiff’s silver was stored in the guesthouse. Mrs. Wachtl, who had the keys to the guesthouse, was sent for and admitted Captain Clayton and Mrs. Boone into the caretaker’s room in which a trunk containing silverware belonging to plaintiff was stored. At Captain Clayton’s direction, over Mrs. Wachtl’s protest, and after the caretaker Speigner’s refusal to open it, the trunk was opened, and some 301 pieces of *254 silver, mostly flatware, including knives, forks, and spoons, were removed on July 13, 1945, and taken to the Haus am See for use by occupants of the rest center. The silver was engraved with a crest and the initials “M. P.” At the time the silver was taken, Captain Clayton and Mrs. Boone signed a receipt describing the silver, and this was given to Mrs. Wachtl. The evidence shows that when the Army ended its occupancy of the house, a good many pieces of the silverware were missing.
There is no proof that defendant’s representatives removed any additional silver belonging to plaintiff from the trunk, except that a notation on the receipt indicates that three days after the taking on June 13, 36 additional pieces may have been taken, although the quantity of tableware taken by Captain Clayton amounted to only about one-tenth of the silver contained in the trunk at the time. When Mrs. Wachtl’s daughter was married in Unterach in 1946, a complete silver service belonging to plaintiff was used at the wedding. The silver bore the same crest and initials as that removed from the trunk in July 1945 by Captain Clayton. Plaintiff has acknowledged that the silver used at the wedding was recovered in 1948, and no claim has been made' for it in the schedule filed as an amendment to the petition on April 30,1956.
In July 1945, when the above-described silver was removed from plaintiff’s trunk in the caretaker’s room in the guesthouse, the two additional trunks containing silverware which plaintiff had stored in the same room in September 1935, if they were still in the room, were not molested. We do not know what happened to the two additional trunks of silverware.
31. In addition to the plaintiff’s kitchen utensils, which were found in a box in the attic, the kitchen utensils used by the Army during the operation of the rest center consisted of brown enameled ware of the German Army type.
There were a considerable number of sheets, pillowcases, and blankets belonging to plaintiff in the Haus am See when the Army took possession of the premises. The evidence does not show to what extent plaintiff’s blankets and linens were used by defendant, but the Army obtained bed linen *255 from Quartermaster stores and required each guest to provide his own towels. Most of the blankets used by the visitors in the rest home Avere of Army issue.
32. The Haus am See was in use as an Army rest center from July 17,1945 to June 30,1947.
Captain Clayton remained in charge of the rest center until about October 1, 1945. While he was there, property 100 was used as a rest center for officers of company grade, i. e., up to the rank of captain. They came in groups of from 10 to 20 young officers, and each group stayed for about a week. On alternate nights during the week, entertainment was provided by musicians and other entertainers obtained locally. Dances were held. Alcoholic beverages were consumed by the officer-guests, but there is no evidence of excessive drinking.
While they were at the center, the officers engaged in fishing, boating, and swimming in the lake. They also pitched horseshoes, played ping-pong, and tried to play baseball.
From the spring of 1947 until the Army vacated the property 100 on June 30,1947, the house was used primarily as a rest center for staff officers of the rank of colonel and above. There were about 15 such officers. On week-ends, one or two of them, with their wives and children and members of their staffs, visited the house.
33. When Captain Clayton left Unterach about October 1, 1945, Lt. Ball of the 91st Division became the officer in charge of the Haus am See, and on April 5,1946, he was succeeded by Lt. Billy Brown of the 42nd Division. About July 1,1946, Lt. Robert Riley of the 42nd Division became the responsible officer in charge and remained in that position until after the Army vacated the premises.
34. On July 16, 1945, Mrs. Boone and her sister-in-law made an inventory of all of plaintiff’s rugs that were then in the Haus am See.
There is some evidence that Captain Clayton made a one-page inventory of the personal property in the house after he took up residence there about July 1,1945, but if such an inventory was made, it was not found or offered in evidence. No other inventory of plaintiff’s personal property in the house was made by any agent of the Army until July 1946.
*256 35. On January 11,1946, the Military Government, a part of the Army organization in Austria, appointed the Bank of Upper Austria and Salzburg, hereinafter called the Bank, as the administrator of house 100 and all contents thereof. On April 5, 1946, the Haus am See was formally requisitioned by the Army.
The Bank did not have access to the house during the period of Army occupancy, but in July 1946, a representative of the Bank visited the premises and, with the assistance of Lt. Eiley and Mrs. Boone, made a complete inventory of all of plaintiff’s personal property that was then located on property 100. The location of each article was shown and every item was numbered.
36. On July 11,1947, the Army released the property 100 to the custody of the Bank. On that date, a representative of the Bank and Lt. Eiley carefully checked the 1946 inventory against the personal property then on hand. With the exception of 164 pieces of broken china and glassware, it was determined that all of plaintiff’s property which was listed in the July 1946 inventory was in the house or other buildings on the property on July 11, 1947. Thereupon, the Bank’s representatives signed a form accepting custody of the property covered by the inventory. The Bank also appointed one Polzer, who had previously been employed by the Army, as caretaker of plaintiff’s property and he served in that position until November 1,1948.
37. When the July 1946 inventory was taken, a good many pieces of the silver taken by Captain Clayton from plaintiff’s trunk in the guesthouse were missing. On July 11,1947, all of plaintiff’s silver that was included in the July 1946 inventory was in the Haus am See.
38. Plaintiff was furnished a copy of the July 1946 inventory. Written notice was given to plaintiff by headquarters of the Army in Austria that property no. 100 was no longer required for Army use and that possession would be returned to her effective July 1,1947.
39. The Army did not occupy the guesthouse (property no. 99) or the Wachtl Villa at any time pertinent to this action.
*257 40. On November 29, 1947, the Bant, as administrator of plaintiff’s property, filed with, the Office of War Damages of the Province Government of Upper Austria a claim in the sum of 28,610 Austrian schillings for damages arising out of the occupation of house 100 by American troops from April 5,1946 to July 1,1947. 9,500 schillings were claimed as the restoration cost of three damaged paintings, and 19,110 schillings were requested as compensation for the breakage of 164 pieces of china, crystal, and glassware.
The letter transmitting the claims stated that the owner had given notice to the Army that she reserved the right to claim damages incurred during the period prior to April 5, 1946. The above-described claim represented the Bank’s determination of the damage to and loss of plaintiff’s personal property that was caused by the American occupation during the period between July 1946, when the Bank’s representative, Lt. Biley, and Mrs. Boone made the inventory of plaintiff’s personal property, and July 11, 1947, when the Bank’s representative again checked the inventory against the property on hand and accepted custody thereof from Lt. Biley.
41. Plaintiff returned to Unterach with her husband early in August 1948, and on or about August 4,1948, they packed a large quantity of plaintiff’s personal property in boxes and crates for shipment to the United States. They made an inventory of the packaged and crated goods, which included articles which plaintiff had removed from the Wachtl Villa (no. 125) and the guest house (no. 99), which properties were not under the administration of the Bank, as well as articles from house 100. The inventory made by the plaintiff and her husband and signed by both was entitled “Inventory of Household Goods, Furniture and Works of Art owned by Mrs. Maria Jeritza Seery in Houses in Unterach am Attersee, Upper Austria.” The articles were packed and the inventory was made outside the presence of any representatives of the bank and outside the presence of the caretaker whom the bank had appointed for property no. 100. The necessary export papers were obtained from the Austrian Minister of Finance, and all of the personal property listed in the inventory (in evidence as defendant’s exhibit 86) arrived in *258 the United States about March. 17, 1949, and was unpacked in October 1949.
42. Early in August 1948, and at about the same time defendant’s exhibit 36 was prepared, plaintiff and her husband also made an inventory of the contents of house no. 100, which personal property she intended to leave and did leave in the house in Unterach after her departure about August 17, 1948. The caretaker appointed by the Bank later checked this inventory against the personal property left in the house, and on August 15, 1948, a representative of the Bank acknowledged receipt of a copy of the inventory, in evidence as plaintiff’s exhibit 37-A.
Also, at or about the same time the above-described inventories were made, plaintiff and her husband made an inventory of the contents of the guesthouse (no. 99) that were to be left and were left there after she returned to the United States. This inventory was checked against the property on hand by one Hoffman, a caretaker appointed by plaintiff. The Bank also acknowledged receipt of a copy of the document, in evidence as plaintiff’s exhibit 38-A.
43. The inventory of goods plaintiff shipped to the United States (defendant’s exhibit 36) listed 2,687 articles, and the inventory of the property left in house 100 in August 1948 (plaintiff’s exhibit 37-A) contained 892 pieces, a total of 3,249 pieces. The inventory of July 1946, made by a representative of the Bank, Lt. Riley, and Mrs. Boone (plaintiff’s exhibit 7)[1], listed 1,007 numbered items, representing 2,357 pieces. That inventory did not list the contents of boxes, trunks and suitcases, but only the containers.
44. On August 9, 1948, Mr. Landzettel, a representative of the Bank, in company with an officer of the Property Control Office of the Army, visited plaintiff at Unterach. When Mr. Landzettel learned that plaintiff had removed many articles of her personal property from the rooms where it had been located in house no. 100 and had packed these articles in the boxes with personal property that she had removed from the Wachtl Villa and the guesthouse, he protested that this action had been taken without notice to the Bank and stated that the Bank, which was responsible for the inventory of her personal property in house 100, had *259 desired to release the property covered by the Bank’s inventory to plaintiff before the property was removed from the rooms described in the inventory. The boxes and crates containing the property shipped to the United States were not closed at that time. No move was made by Mr. Land-zettel or the American property control officer to unpack, or examine the contents of, the boxes. Copies of the inventory of the goods shipped were given to the Bank and to the moving company which handled the shipment.
Mr. Landzettel again visited plaintiff at Unterach on August 16,1948, and advised plaintiff that the Bank wished to be released as administrator of her property and to be relieved from responsibility for the personal property which had been in its custody. On the same day, plaintiff wrote the Bank the following letter:
To-day I transferred S 35,000. — (thirty-five thousand) to my- administrative account at your bank of which amount you are to pay immediately the loan of the Sparkasse Linz. _ The rest is to be used to pay for taxes and expenses arising during the current and next year and the salary of the caretaker.
At the same time I wish to inform you that I ordered CID to take care of the finding and bringing back of those articles which were lost during the time when the house no. 100 requisitioned by U. S. troups [sic].
In connection with this, I certify that when I arrived I found all articles which you took over from the American Beal Estate as per inventory, in full order. The losses and theft ocurred [sic] before 1 July 1947. I kindly ask you, especially Mr. A. Landzettel, who is most familar [sic] with the administrative matters here, to assist the CID as far as possible.
Yesterday I informed a Mr. Mackenzie of Property Control Branch and Mr. Landzettel of your bank of all my wishes regarding the continued administration.
On the following day, plaintiff wrote another letter to the Bank, which was also dated August 16, 1948, and stated:
I ask you to return my letter, dated 16 August 1948 which was handed over to you by Mr. Landzettel, to my address in New York and to disregard it.
In regard to the inventory I inform you that I have sent the entire inventory which I found in a desolate' state, to America.
*260 I leave it up to the authorities to check the completeness of the inventory on hand of the various inventory lists. When I left my property in 1935 it was in an accurate state. I reserve my right for any further claim and will inform you of such steps.
*****
45. On August 9, 1948, plaintiff had informed a representative of the Army Office of Property Control that a great deal of her personal property was missing as a result of the Army’s occupancy of the Haus am See. The Chief of Property Control refused to accept responsibility for the loss, stating his office had no control over the property until after the house was vacated by the Army. However, plaintiff’s complaint was referred to the Criminal Investigation Division, and two of its representatives visited her on August 16, 1948, in company with Mr. Landzettel of the Bank. Plaintiff informed them that when she departed from Unterach in 1935, her property had been left in the custody of her nephew, Leo Wachtl; that the Haus am See had been luxuriously furnished, and that a great many articles of her personal property were missing when she returned in August 1948. Plaintiff stated that her personal property was spread all over Unterach and declared that two of her rugs were in the possession of Dr. Wotruba, a brother of Mrs. Boone, who had visited the latter on several occasions during her residence in house no. 100. She also said that some of her property might have been taken by Dr. Gyssling and that the largest portion of the missing property may have been removed by Mrs. Boone, who left Unterach for the United States in August 1946. The representatives of the CID advised plaintiff that they could not recover any stolen property without a complete inventory of the articles which she had left in her houses in Unterach. Plaintiff replied that, in view of the lapse of so many years, she could not remember exactly what the articles were or what some of them looked like, but that she believed she had a complete inventory that was taken in 1935 of the contents of house no. 100, and that upon her return to the United States, she would mail a copy of the inventory to the CID.
During the same conversation, plaintiff told the CID representatives that an American Army captain and Mrs. *261 Boone had broken open one of plaintiff’s trunks and removed silver therefrom.
As stated in a subsequent finding, plaintiff did not send a copy of her 1935 inventory to the CID or other representative of defendant.
46. During her conversation with the agents of the CID, plaintiff stated that she was returning to the United States on the following day, but she named a friend in Unterach who would be able to identify any of her property that might be found.
The representatives of the CID made a thorough search of Dr. Wotruba’s premises and also searched the store of a local antique dealer to whom Mrs. Boone had delivered some rugs for sale. A few days later a search was also made of Dr. Gyssling’s home. None of plaintiff’s property was found at any of these locations, and the CID eventually closed its file because of its failure to find any evidence of larceny.
47. When plaintiff returned to Unterach in August 1948, she found that all three of her properties there were badly in need of repair. The condition of the buildings was due in part to the fact that, aside from the work done by the Army, no repairs had been made to the properties since 1935, but some of the repairs were necessitated by the damage done to house no. 100 by the various occupants thereof. On August 4,1948, plaintiff had a local builder make an estimate of the cost of the repair work needed for all three properties. His written estimate stated that the sum of 24,852.60 Austrian schillings would be needed for the repair of house no. 100 and that an additional 8,267 schillings would be required for the repair of the boathouse. At plaintiff’s direction, he proceeded with the work and in September 1948, he wrote plaintiff that an additional 7,339 schillings were needed for the repair of the roof. The record does not show when he completed the job on the three properties, but on June 12, 1950, he signed a receipt showing that plaintiff had paid him in full for the costs as estimated.
Included in the amount paid for work on the Haus am See were repairs to the roof, chimney flashings, and gutters; painting of the buildings; replacement of rotten boards *262 in the boathouse, and the dismantling and packing of four ceramic stoves. The evidence does not establish how much of the amount plaintiff expended for the repair work was necessitated by damage done by the various occupants of the house after 1935, and how much was due to the fact that no repair work had been done for 13 years.
48. On September 15,1948, the War Damages Division of the Government of Upper Austria awarded the sum of 3,573.07 schillings on the claim of 28,610 schillings which the Bank had submitted on November 29, 1947, and offered to pay that amount to the Bank upon its execution of a release.
By reply of September 22, 1948, the Bank stated that after it had informed plaintiff of the amount awarded, she had instructed the Bank to refuse the offer and to request that her claim be reexamined. The reply also pointed out that the Bank could not sign the release, because it had expressly reserved plaintiff’s right to claim additional damages.
49. On October 26, 1948, the builder with whom plaintiff had contracted in August 1948, to repair her three properties, prepared and sent the Bank an estimate in the sum of 46.719.60 schillings for the restoration of property no. 100. He described the estimate as a “List of restoration costs of here mentioned damages to Buildings and objects, oc-curing [sic] during the time of occupation by American troops from the time of June 1,1945 to July 1,1947.” There is no competent evidence to establish what part of his estimated restoration costs was due to the occupation of the property by the Army and what part was due to other causes. His estimate of the costs of restoration included a number of jobs to be done that were not listed in the statement of repair work he furnished plaintiff on August 4, 1948.
On October 27, 1948, the Bank submitted a claim of 46,-719.60 schillings for damages to the house and other facilities on property 100 to the Office of War Damages of the Government of Upper Austria. The claim was based upon and was accompanied by a copy of the builder’s estimate of October 26,1948.
*263 50. No award was made in 1948 on the claim which the Bank had submitted for damages to the real property. However, as a result of the Bank’s request for reconsideration of plaintiff’s claims, a representative of the Office of War Damages of the Government of Upper Austria made an inspection of property 100 on May 2, 1949. When the inspection was made, some of the repairs which plaintiff had contracted for in August 1948 had been completed. On the basis of the inspection report, an official of the Office of War Damages of the Government of Upper Austria determined that the amount of plaintiff’s indemnification for the loss of and damage to her personal property should be increased from 3,573.07 schillings to 4,214.10 schillings and that an award of 4,786.50 schillings should be made for damages to the buildings — both amounts on account of the American occupation. The total amount so determined was 9,000.60 schillings. By a decree of August 23, 1951, the Austrian authorities fixed the sum of 12,614 schillings as the amount to be awarded to plaintiff in satisfaction of both her claims. The evidence does not show how much of the award was for damages to personal property and how much was for damages to the real estate.
On October 12, 1951, Ernst Koller, an artist’s agent and concert manager, wrote the Office of Finance of the Government of Upper Austria, stating that he was the authorized agent for the artistic and financial interests of the plaintiff and that she had compiled a claim in the amount of 75,539.60[1] schillings as compensation for the damage to her real and personal property' because of the American occupation during the period from April 5,1946 to July 1,1947. The letter further stated that the writer had discussed the award of 12,614 schillings with plaintiff and that she “does not conceive that she shall be dismissed with a bagatelle of S 12,000.00 for a damage which was done to her and for which she had to spend the demanded sum in cash.” The letter concluded with the statement that if the Austrian authorities did not settle plaintiff’s claim she would place it in the hands of her attorney in America. In a reply of October 20, 1951, the Austrian District Director of Finance wrote Mr. *264 Koller that the decree of August 23,1951, by which plaintiff had been awarded 12,614 schillings, could not be increased. With respect to the amount awarded, the reply also stated: “As to the instant case, there is not involved full compensation of damages but rather an indemnity paid not by the American Occupation Power but by the Austrian State.” When he testified at the trial, the writer of the letter explained the meaning of the quoted statement by saying that the Austrian authorities had made the award of 12,614 schillings on the basis of the 1945 values of the property, plus additions of 50 percent in some instances.
The award made by the Austrian authorities was not paid to or accepted by plaintiff. As stated in a subsequent finding, plaintiff filed a claim directly with the Army, and thereafter decided to bring this action when she learned that the Army had referred the claim to the Austrian authorities.
51. At the time the Americans occupied plaintiff’s property and at the time the Austrian authorities made the award to plaintiff, as described above, the rate of exchange of the Austrian schilling was ten to the dollar.
52. In May 1948, plaintiff had been notified that the Army Office of Property Control in Austria desired to release all property of allied nationals to agents appointed by the owners, and stated that where the owner appointed no agent, the property would be turned over to Austrian authorities for administration as “absent owners property”.
On receipt of the information, plaintiff wrote the Army on August 15,1948, as follows:
In connection with the three houses and the property therein which I own in Unterach, May I request of you
1. That the United States Army, now in control, continue its control, as I think that would insure better propection [sic] and guardianship.
2. That the United States Army initiate an investigation as to what has become of the property taken and now, I believe, lodged in private houses and hotels and elsewhere, as the Army can do it better than any other agency.
Inasmuch as the Army took it in custody, I would like it to continue, and, as far as possible, restore it in the same condition with all its contents.
*265 If the Army does not continue its control, I am faced with, the possibility of the Austrian Governments taking over, with no assurance of competent or diligent supervision iby the agent it selects; and I have not the alternative of appointing a local Bank, as they do not undertake such work.
The caretaker of the property, Mr. Fritz Polzer and Mr. Landzettel of Linz, have the necessary information as to the location of the missing property.
I have spoken at length with Major Howard A. Mackenzie of Linz of Civil Affairs Property Control and he is familiar with all the details.
sf: ‡ $
In response to plaintiff’s request, the Office of Property Control agreed to retain the property under its control, the Bank continuing as administrator for an additional period of 60 days, with the understanding that plaintiff would appoint an attorney to act for her in her absence and to accept the property when it was released. During the latter part of October 1948, plaintiff appointed Alfred Land-zettel as her agent to accept custody of the property, and on November 9,1948, the property was released by the Army to Mr. Landzettel, and the Bank was discharged as administrator.
53. Plaintiff returned to New York from Austria about September 2, 1948. Shortly thereafter, plaintiff with the assistance of her secretary, who had been with her for 25 years, prepared a detailed schedule of a claim for the loss of and damages to her real and personal property in XJn-terach. The claim, which was submitted to the Department of the Army by her attorney on June 29, 1949, requested compensation in the amount of $597,419 for loss of and damage to plaintiff’s personal property in houses 99 and 100, $18,000 for the rental of house 100 for three years, and $4,671 for damages to the main house and boathouse on property 100.
The claim was dictated to a stenographer, and the detailed descriptions of the articles, their dimensions, the dates of acquisition, the sources from which the articles were obtained, and the values thereof, were supplied by plaintiff or her secretary. In preparing the claim, plaintiff used a copy of the inventory which she had made in Unterach in *266 1935 and which .she found upon her return to the United States in 1948. However, with respect to the articles which were shipped from Vienna to Unterach in 1935 after plaintiff’s departure and which were not listed in the 1935 inventory, plaintiff relied on her memory. She attempted to exclude from the claim the articles of personal property which she had found and inventoried in Unterach in 1948, including both the property shipped to the United States and that left in house 100 in 1948. As stated above, the claim was filed with the Army on June 29, 1948, and in January 1950, plaintiff and her secretary executed affidavits in support of the claim, and the affidavits were also sent to the Department of the Army.
The goods plaintiff shipped from Unterach in August 1948 arrived in New York on March 17, 1949, and were stored in two private garages in New Jersey. Early in October 1949, plaintiff moved into a house in Newark, New Jersey, unpacked the goods, and discovered that they included a number of articles of personal property that had been listed in the claim filed with the Department of the Army. The failure to exclude the articles from the claim was due to differences in the terminology used in describing the articles in the 1935 inventory from the descriptive language used in the 1948 inventories. Plaintiff did not inform her attorney of this discovery until sometime afterward. When her petition in this suit was filed on June 30, 1952, the articles referred to were omitted from the schedule attached to her petition. After a further comparison of the articles of personal property shipped to the United States in 1948 with those listed in the schedule to the petition, plaintiff filed an amended schedule to her petition on April 30, 1956, and at that time further reductions in the number of articles claimed were made.
54. As stated in finding 8, plaintiff’s copy of the 1935 inventory covering part of the personal property she left in houses 99 and 100 in Unterach in 1935, was stolen on November 30, 1948. During approximately three months, while this inventory was in plaintiff’s possession after she returned to this country and before it was stolen, plaintiff did not copy, or otherwise have the inventory duplicated, *267 nor did she mail a copy thereof to the Criminal Investigation Division of the Army in Austria as she had agreed to do when interviewed by representatives of that organization on August 16, 1948. She discussed the matter with her attorney, and since she had prepared a claim which was thereafter filed with the Department of the Army, it was decided not to send a copy of the inventory to the CID.
55. On August 28, 1949, plaintiff was advised that the claim which she had filed against the Army had been referred to the Government of Austria under the terms of the Austro-American Agreement of June 21, 1947. Plaintiff protested this action, and thereafter on June 27, 1952, her attorney notified the Department of the Army that she had elected to withdraw the claim and to institute this suit.
56. In Amended Schedule A to the petition, plaintiff claimed the sum of $257,848.10 as the reasonable value of the personal property in houses 100 and 99. She .alleged that such personal property was lost or destroyed while houses 99 and 100 were requisitioned, occupied, and used by the military forces of the defendant from July 1945 to July 1, 1947. A complete list of the personal property for which such compensation was sought is set forth in Amended Schedule A to plaintiff’s petition. Since the trial, plaintiff has determined that a number of the articles listed in the schedule were recovered by her and has requested that the amount claimed in the schedule be amended to reduce the claim for loss of personal property to the sum of $241,843.83.
While the Ilaus am See was occupied and used by the Army as a rest center, a good many pieces of plaintiff’s silver flatware were lost, and a good many articles of plaintiff’s china, crystal, and glassware were broken or lost.
57. There is no proof that the Army authorized its personnel to appropriate or destroy any of plaintiff’s personal property, and except as stated in finding 56 above, there is no evidence that any of the contents of the house 100 belonging to plaintiff was removed or destroyed by members of the Army. The Army regulations in effect at the time the Haus am See was used as a rest center required each member *268 of the Army to obtain a bill of sale or a paid receipt for any article of personal property before it could be shipped from Austria to the United States. The parcel to be shipped could not be accepted at the post office until the bill of sale or receipt was displayed there, and the regulations also required that the receipt be placed inside the package before it was wrapped and mailed.
58. Plaintiff makes no claim for the damage to the three paintings described in the claim filed with the Austrian authorities by the Bank (finding 40).
59. In Amended Schedule B to her petition, plaintiff claims the sum of 40,458.60 schillings, or $4,045.86, for damages caused to the Haus am See and the boathouse by the Army during its occupation and use of the premises. The amount claimed is the sum which plaintiff paid to the local builder in Í948 for the repairs described in finding 47. There is no satisfactory or convincing evidence showing what portion of the amount plaintiff spent for repairs was required by reason of the damage caused by members of the Army during the operation of the rest home. The builder’s estimate of the costs paid by plaintiff shows on the face thereof that some of the work done was due to the fact that the property had not been repaired for 13 years rather than to damage caused by the occupants of the premises.
60.. In item “C” of Amended Schedule B to plaintiff’s petition, the sum of 77,000 schillings, or $7,700, is claimed as the restoration cost, including landscaping services, of the garden which plaintiff had planted on property 100 in 1931. As stated in finding 28, the garden, including all of the flowers and most of the shrubs, had died through lack of care or had been removed prior to the time the Army took possession of property 100. There is no satisfactory proof that the garden was damaged as a result of the occupation and use of the property by the Army.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is there *269 fore adjudged and ordered that sire recover of and from the United States eleven thousand dollars ($11,000.00), which amount includes any interest which might be payable as a part of just compensation.

 This was the total of the two claims filed in behalf of plaintiff by the Bank.