**R. J. WIDEN COMPANY**

v.

**The UNITED STATES and COMMON-
WEALTH OF MASSACHUSETTS,
Third-Party Defendant.**

**No. 80-62.**

United States Court of Claims.
March 18, 1966.

Whitaker, Senior Judge, dissented in part.

Jerome P. Facher, Boston, Mass., for plaintiff; A. Frederick Richard, Boston, Mass., attorney of record. Hale & Dorr, Boston, Mass., of counsel.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Robert L. Meade, Asst. Atty. Gen., Commonwealth of Massachusetts, for third-party defendant; John S. Bottomly, Asst. Atty. Gen., attorney of record. Edward W. Brooke, Atty. Gen., of counsel.

Before COWEN, Chief Judge, WHITAKER, Senior Judge, and LARAMORE, DAVIS and COLLINS, Judges.

PER CURIAM: *

In this suit plaintiff seeks to obtain just compensation under the Fifth Amendment (1) for injuries to its personal property and business resulting from governmental action in connection with construction of a flood control project, and (2) for the rental value of its lands that were occupied by the government during the initial phases of that project.

The Flood Control Act of 1936, as amended in 1941, authorized federal construction of various flood control projects, including one on the Hoosac River in North Adams, Massachusetts.[1] It also provided that "no money appropriated under authority of this Act shall be expended on the construction of any project until States, political subdivisions thereof, or other responsible local agencies have given assurances satisfactory to the Secretary of War that they will (a) provide without cost to the United States all lands, easements, and rights-of-way

---

* This opinion incorporates, with minor added discussion, the opinion prepared, at the direction of the court under Rule 57(a), by Trial Commissioner Herbert N. Maletz.

[1]. Public Law 738, 74th Cong., 49 Stat. 1570 (1936), as amended by Public Law 228, 77th Cong., 55 Stat. 638 (1941).

necessary for the construction of the project * * * ; [and] (b) hold and save the United States free from damages due to the construction works; * * *." [2] In accordance with these requirements and pursuant to State-enabling legislation, the Commonwealth of Massachusetts, in November 1950, executed an agreement with the United States specifying in part that the Commonwealth would provide, without cost to the United States, all land and easements necessary for the North Adams flood control project and would indemnify the United States for any damages due to the construction work. Thereafter, in January 1957, the Army Corps of Engineers awarded a contract in the amount of some $5,400,000 for construction of the project and in the following month directed the contractor to proceed with work at the physical site.

Plaintiff was the owner of property in North Adams, Massachusetts, situated on the north bank of the Hoosac River, a non-navigable stream. The property consisted of some 50 acres of land on which was located a tannery plant which was specifically designed for the manufacture of specialty leathers, i. e., leathers used for a variety of purposes other than shoe leather. Plaintiff's property also included a dam constructed across the Hoosac River about one-half mile upstream from the main tannery plant and a set of headgates behind the dam to control the flow of water from the river into a canal belonging to plaintiff. The canal carried water from the upstream part of the river to the tannery plant and also carried effluent away from the plant to the downstream part of the river. The water from the river was used by the tannery in huge quantities in the processing and manufacture of leather and in the washing away of the effluent, and without such water it was not possible to produce specialty leathers.

In the latter part of March 1957, the Corps of Engineers' contractor, pursuant to the directive to start work at the site, entered upon plaintiff's property without its permission, cut trees, bulldozed the land, removed soil, used the land as a dumping ground, and destroyed plaintiff's dam and headgates, thus diverting the course of the water from the Hoosac River away from the canal leading to the tannery.[3] This caused the plaintiff to lose its vital water supply, as a result of which it suffered losses of various kinds. Many hides that it had on hand rotted and could not be used in manufacture. Other hides had to be processed in a makeshift manner or to be contracted out to other firms for finishing, resulting in losses or reduced profits to the plaintiff. The lack of water also had a deleterious effect on certain wooden machinery and equipment which dried out and deteriorated without constant moisture. Also, with the termination of its water supply from the river, the plaintiff was effectively forced to abandon the production of specialty leather and alter its operations so as to manufacture lower-grade leather products, thus causing it to lose orders, profits, and customers and to incur expenses in having to redirect its activities.

On July 2, 1957, the Commonwealth of Massachusetts (which as previously indicated had agreed with the United States to acquire all the land, easements, and rights-of-way necessary for the construction of the flood control project and to save the United States harmless from all claims for damages) made a formal taking of a part of plaintiff's real es-

2. Section 2 of the 1941 amendment to the Flood Control Act also provided that "in any case where the total authorization for a project heretofore * * * authorized by Congress is not sufficient to complete plans that may have been made the Chief of Engineers is authorized in his discretion to plan and make expenditures on preparations for the project, such as the purchase of lands, easements, and rights-of-way * * *."

3. No formal taking of plaintiff's property was ever made by the United States, nor has the United States ever instituted eminent domain or condemnation proceedings with respect to the property.

tate. In 1958 the plaintiff brought suit in the State Superior Court against the Commonwealth for damages resulting from the latter's taking of its land, easements and water rights. At the trial of that case, a stipulation was entered into between the parties that the dam and water rights were intact on July 2, 1957, the date of the formal taking, and that water from the dam was then available to plaintiff. The stipulation was contrary to the actual facts, inasmuch as the dam had been destroyed and the water to plaintiff's plant cut off by the Corps of Engineers' contractor in March; the assumption was, however, agreed upon to shorten and simplify the trial by fixing one certain date (i. e., the date of the formal taking) upon which the Commonwealth agreed it would be liable for the damage to the real estate caused by the taking of a portion of plaintiff's property and of its water rights.[4]

After completion of the testimony, the Judge instructed the jury, in accordance with applicable Massachusetts law, that the plaintiff was entitled to receive the fair market value of that portion of the real estate formally taken, and severance damages for the diminution in value of the remainder of the property not actually taken, which latter item represented the difference in market value of plaintiff's remaining real estate before and after the destruction of its water supply from the river.[5]

Plaintiff obtained a jury verdict in the amount of $171,090.20, and this amount was paid by the Commonwealth. Thus, the plaintiff concededly has been fully compensated for damages to its real estate as a result of the July 1957 taking by the Commonwealth of its land, water rights, and dam, and as a result of the diminution in value of its remaining real estate caused by the cut-off of its source of water from the river.[6] However, the applicable Massachusetts law did not authorize recovery for incidental or consequential damages resulting from the Commonwealth's taking (see infra, p. 995) and, therefore, no award of damages was recoverable by plaintiff in the Superior Court proceeding and no issue was actually litigated therein for: (1) damage to any personal property, including spoilage of hides; (2) damage to movable machinery and equipment; (3) business expenses incurred as a result of the loss of water; or (4) loss of profits. Plaintiff seeks here to recover for these items,[7] contending that the destruction of its personal property and injury to its business as a result of the action of the Corps of Engineers' contractor in March 1957 constituted a direct "taking" by the United States for which compensation is due under the Fifth Amendment or under an

4. In the Superior Court proceeding, the plaintiff was faced with a serious dilemma. The Commonwealth there took the position that it was not responsible for any real estate damage prior to July 1957, when it made the formal taking. Since the United States was not and could not be a party to that proceeding, it thus could not be charged with real estate damage its action had caused. The first two days of trial in the Superior Court reflected this dilemma in the exclusion of evidence offered by the plaintiff which antedated the Commonwealth's formal taking. The practical resolution of this difficulty was the stipulation of the parties by which the assumption was made that on July 2, 1957 all of the real estate was intact when the Commonwealth made its taking.

5. The applicable Massachusetts statute, General Laws (Ter. ed.) c. 79 § 12, provided in part that "The damages for property taken under this chapter shall be fixed at the value thereof before the taking, and in case only part of a parcel of land is taken there shall be included damages for all injury to the part not taken caused by the taking * * *."

6. The award also covered machinery and installations which were fixtures and thus part of the real estate.

7. Plaintiff also seeks to recover the rental value of that part of its land which was occupied by the government's contractor during the period extending from March 25, 1957 to July 2, 1957. This claim is considered in a later part of this opinion.

implied promise to pay for property appropriated.[8]

For the reasons indicated below, it is concluded that the government contractor's entry in March 1957 upon plaintiff's land and its destruction of the dam and headgates, without plaintiff's permission, were authorized acts of government and hence constituted a taking by the United States of plaintiff's real estate and water rights. It is further concluded that there was no taking in the constitutional sense of plaintiff's personal property and business and that the damages thereto, all of which were occasioned by the termination of plaintiff's water supply from the river, were incidental to, or the consequences of, the government's taking of the real estate and water rights, and as such are not compensable.

■ It seems clear at the outset that the action which was taken here—the entry upon plaintiff's land and the destruction of its water rights without its permission—was a governmental act (through an authorized contractor) performed pursuant to Congressional authorization under the Flood Control Act of 1936, as amended. See United States v. Lynah, 188 U.S. 445, 465–466, 23 S.Ct. 349, 47 L.Ed. 539 (1903); Portsmouth Harbor Land and Hotel Co. v. United States, 260 U.S. 327, 330, 43 S.Ct. 135, 67 L.Ed. 287 (1922); North American Transp. & Trading Co. v. United States, 253 U.S. 330, 333, 40 S.Ct. 518, 64 L.Ed. 935 (1920). Cf. Hooe v. United States, 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055 (1910). For while that Act prohibits the expenditure of flood control funds on a project until the state or a local subdivision or agency has given assurance that it will provide the land without cost and indemnify the United States for damages, it also provides that "where the total authorization for a project heretofore * * * authorized by Congress is not sufficient to complete plans that may have been made the Chief of Engineers is authorized in his discretion to * * * make expenditures on preparations for the project, such as the purchase of lands [and] easements * * *." See footnote 2, supra. As the legislative history indicates, this latter provision was inserted in order to give the Chief of Engineers broad authority to begin and prosecute needed projects without delay, even though authorizations at the time might be insufficient to complete all the work. H.Rept.No. 759, 77th Cong., 1st Sess. (1941) pp. 6–7.[9] From this it seems evident that under the statute the Chief of Engineers was authorized to start the present project and acquire the necessary lands and easements as soon as he received assurances that the Commonwealth would reimburse the United States for the cost of such acquisitions and hold it free from liability for damages. This being the case, the acts of the government's contractor, on behalf of the United States, constituted a "taking" by the United States of plaintiff's real estate and wa-

8. It is immaterial whether the theory of the present suit is that there was a taking of property under the Fifth Amendment or that there was an implied promise to pay for it. In either case, the claim is based upon the Fifth Amendment and a promise is implied because of the duty to pay imposed by that Amendment. See Cotton Land Co. v. United States, 75 F.Supp. 232, 234–235, 109 Ct.Cl. 816, 830–832 (1948), and cases there cited.

9. Thus the House Report stated in part "There have * * * been placed in section 2 of this bill some important provisions which will permit initiation and partial accomplishment of projects which might otherwise be delayed for long periods of time due to lack of sufficient advance authorizations for the completion of large projects." Id. p. 6. The report also stated: "In section 2 of this bill the Chief of Engineers is given the authorization to begin and prosecute projects in whatever way he may determine to be advantageous under the conditions and circumstances that obtain from time to time." Id. p. 7. Manifestly, the authorization of $2,178,000 which was provided in the Flood Control Act amendments of 1941 (55 Stat. 638) for the North Adams and two other projects was insufficient considering that the contract for the construction of the North Adams project was itself in excess of $5,000,000.

ter rights which gave rise to an obligation—since satisfied by the Commonwealth—to pay just compensation therefor.

Considered now against this background is plaintiff's contention that the destruction of its personal property and injury to its business as a result of the action of the government's contractor in March 1957 constituted a direct taking of its personal property for which just compensation is due. It is quite correct, as plaintiff indicates, that to constitute a taking under the Fifth Amendment it is not necessary that property be absolutely "taken" in the narrow sense of that word to come within the protection of this constitutional provision; it is sufficient if the action by the government involves a direct interference with or disturbance of property rights. See e. g., Pumpelly v. Green Bay Co., 13 Wall. 166, 80 U.S. 166, 20 L.Ed. 557 (1871); United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539 (1903); United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917). Nor need the government directly appropriate the title, possession or use of the properties in question since it is "the deprivation of the former owner rather than the accretion of a right or interest to the sovereign [which] constitutes the taking. Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter to amount to a taking." United States v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). For example, it has been held consistently that an overflow of water resulting from government construction projects which materially impairs the use and enjoyment of lands constitutes a constitutional taking of such lands despite the absence of appropriation of title or occupancy. Pumpelly v. Green Bay Co., supra; United States v. Lynah, supra; United States v. Cress, supra. See also Cotton Land Co. v. United States, 75 F.Supp. 232, 109 Ct.Cl. 816 (1948). The principle is applicable to personal property where "the owner is deprived of its use * * * as the natural consequence of the deliberate, intended exercise of an asserted power" of the government. Causby v. United States, 75 F.Supp. 262, 264, 109 Ct.Cl. 768, 772 (1948). See also Kimball Laundry Co. v. United States, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); Todd v. United States, 292 F.2d 841, 845–846, 155 Ct.Cl. 87, 94–96 (1961); Seery v. United States, 161 F.Supp. 395, 142 Ct. Cl. 234 (1958). The decisive factor in each of these cases, and in the others which follow the same principle, is that the personal property or other rights had been *directly* appropriated or destroyed by actions of agents or officials of the government. The losses of property involved in these cases were not merely incidental or indirect consequences of a taking of other property; rather, they were the direct products of the actual invasion or taking of the property involved. United States v. Causby, 328 U. S. 256, 265–266, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). And "it is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking." United States v. Cress, supra, 243 U.S. p. 328, 37 S.Ct. p. 385. Undoubtedly, the United States could here have "taken" plaintiff's personal property and business, in which case just compensation would be due. But this was not done. The only taking in the present case was of the plaintiff's real estate and water rights, for which compensation has been fully paid by Massachusetts: The additional losses claimed in this proceeding are in the nature of consequential damages, that is to say, they were "an unintended incident" of the actual taking. Mitchell v. United States, 267 U.S. 341, 345, 45 S. Ct. 293, 69 L.Ed. 644 (1925). See also e. g., Bothwell v. United States, 254 U.S. 231, 41 S.Ct. 74, 65 L.Ed. 238 (1920); Joslin Mfg. Co. v. City of Providence, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167 (1923); Southern Counties Gas Company of Cal. v. United States, 157 F.Supp.

934, 141 Ct.Cl. 28 (1958), cert. den. 358 U.S. 815, 79 S.Ct. 23, 3 L.Ed.2d 58.

■ It is settled law that in the absence of specific statutory mandate, compensation under the Fifth Amendment may be recovered only for property taken and not for incidental or consequential losses, the rationale being that the sovereign need only pay for what it actually takes rather than for all that the owner has lost. See Monongahela Navigation Co. v. United States, 148 U.S. 312, 326, 13 S.Ct. 622, 37 L.Ed. 463 (1893); Mitchell v. United States, supra. See also Eminent Domain Valuations In An Age of Redevelopment; Incidental Losses, 67 Yale L.J. 61, 67–8 (1957).[10] Hence the incidental spoliation of the plaintiff's inventory and equipment, the reduction or loss of its good will and profits, and the expenses incurred in having to re-adjust its manufacturing operations are non-compensable under long-established legal principles. As the Supreme Court stated in United States v. General Motors Corp., supra (323 U.S. 379–380, 65 S.Ct. 360):

The sovereign ordinarily takes the fee. The rule in such a case is that compensation for that interest does not include future loss of profits, the expense of moving removable fixtures and personal property from the premises, the loss of good-will which inheres in the location of the land, or other like consequential losses which would ensue the sale of the property to someone other than the sovereign. No doubt all these elements would be considered by an owner in determining whether, and at what price, to sell. No doubt, therefore, if the owner is to be made whole for the loss consequent on the sovereign's seizure of his property, these elements should properly be considered. But the courts have generally held that they are not to be reckoned as part of the compensation for the fee taken by the Government. We are not to be taken as departing from the rule they have laid down, which we think sound. Even where state constitutions command that compensation be made for property "taken or damaged" for public use, as many do, it has generally been held that that which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage.[11]

10. A universal exception to this rule is where a portion of the property has been taken causing diminution in value of the remaining property. To prevent serious injustice, the courts uniformly require in such cases (as did the Massachusetts court here) payment for so-called "severance damages" to the remainder. United States v. Grizzard, 219 U.S. 180, 185–186, 31 S.Ct. 162, 55 L.Ed. 165 (1911); United States v. Miller, 317 U.S. 369, 375–376, 63 S.Ct. 276, 87 L.Ed. 336 (1943); 1 Orgel Valuation Under Eminent Domain (2d ed. 1953) § 4. Also in the case of temporary takings, the Supreme Court, in order to avoid special hardships, has allowed proof of consequential losses such as removal expenses and loss of trade routes to be received in evidence as a factor bearing on the market value of the property interests taken. United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945); Kimball Laundry Co. v. United States, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949).

11. In United States v. Petty Motor Co., 327 U.S. 372, 377–378, 66 S.Ct. 596, 599, 90 L.Ed. 729 (1946), the Supreme Court made the following comment: " * * * it has come to be recognized that just compensation is the value of the interest taken. This is not the value to the owner for his particular purposes or to the condemnor for some special use but a so-called 'market value.' It is recognized that an owner often receives less than the value of the property to him but experience has shown that the rule is reasonably satisfactory. Since 'market value' does not fluctuate with the needs of the condemnor or condemnee but with general demand for the property, evidence of loss of profits, damage to good will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings." See also Bothwell v. United States, 254 U.S. 231, 141 S.Ct. 74, 65 L.Ed. 238 (1920); Joslin

Massachusetts case law is to similar effect in denying, in the absence of specific enabling legislation, damages incident to a taking or condemnation, such as personal property and business losses. See e. g., New York, N. H. & H. R. R. v. Blacker, 178 Mass. 386, 59 N.E. 1020 (1901); Bailey v. Boston & P. R. Corp., 182 Mass. 537, 66 N.E. 203 (1903); Boston Belting Co. v. Boston, 183 Mass. 254, 67 N.E. 428 (1903); Nashua River Paper Co. v. Commonwealth, 184 Mass. 279, 68 N.E. 209 (1903); Connor v. Metropolitan District Water Supply Commission, 314 Mass. 33, 49 N.E.2d 593 (1943). The Commonwealth's order of taking of July 2, 1957 formalized what had already become an accomplished fact—the taking by the United States of such real estate and water rights some three months before, with the formal order issued so that the Commonwealth would assume liability for the permanent taking in conformity with its agreement with the United States to provide the latter the necessary lands and easements without cost. Furthermore, if in March 1957 the Commonwealth, rather than the United States, had taken plaintiff's real estate and water rights without a formal order, plaintiff's measure of recovery against the Commonwealth for the damages caused by such taking (which is referred to in Massachusetts as a taking *in pais*) would have been the same as the measure of recovery it actually received under the formal order of taking, namely, the fair market value of the property taken, plus severance damages for the diminution in value of the remainder of the property not taken.[12] See Holbrook v. Massachusetts Turnpike Authority, 338 Mass. 218, 154 N.E.2d 605 (1958); Sullivan v. Commonwealth, 335 Mass. 619, 142 N.E. 2d 347 (1957). Plaintiff having obtained the full measure of damages permitted under Massachusetts law for the taking, the United States is not obligated to pay it more. There is no reason "why the protection given to 'private property' under the Fifth Amendment imposes upon the United States a duty to provide a *higher* measure of compensation for \* \* \* [plaintiff's property] than \* \* \* [is] imposed by the Fourteenth Amendment upon the state \* \* \* [as] the taker. Nor has any reason based on considerations of equity and fair dealing been advanced for justifying a *higher* measure of compensation in the instant case because the \* \* \* [property was] \* \* \* taken for a public project sponsored by the United States rather than by \* \* \* [Massachusetts]. The warrant or authority for putting the United States at such a disadvantage is not apparent." United States ex rel. T. V. A. v. Powelson, 319 U.S. 266, 279, 63 S.Ct. 1047, 1054, 87 L. Ed. 1390 (1943). [Emphasis in original.]

Finally, plaintiff seeks just compensation for the use and occupancy of its property by the United States from March 25, 1957 to July 2, 1957, a period during which plaintiff was deprived of the use and enjoyment of a part of its land without receiving compensation either from the United States or the Commonwealth. In view of the

Mfg. Co. v. City of Providence, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167 (1923); Omnia Commercial Co. v. United States, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923).

12. See footnote 5, supra. Plaintiff contends that § 10 of c. 79 of the Commonwealth's laws authorizes an allowance for personal property, but it is clear, from the decisions of the Supreme Judicial Court, that § 10 does not itself give a right to damages; the section merely provides the procedure for recovering such damages when that right is given by some other provision of law. In this case there is no such provision. Chapter 649 of the Acts of 1950 (authorizing the Commonwealth to give indemnity assurances to the Federal Government) did not empower the state courts to grant relief of the scope sought here. That statute, with its limited purpose of complying with Congressional enabling legislation, does not spell out the specific right to consequential damages which would be necessary if the state's general law of eminent domain were to be modified for this particular project.

fact that the Commonwealth's taking was made on July 2, 1957 and the State Court proceeding was tried on the assumption that the property was intact on that date, it would appear that plaintiff could not have recovered anything from the Commonwealth for the use and occupancy by the United States prior to July 2, 1957. Nor does it appear that the stipulation entered into by the parties during the course of the State Court proceeding was intended to cover such use and occupancy. Since the United States effectively appropriated the land in question for an ascertainable period, thereby interfering with a recognizable property interest of plaintiff, the United States is obliged to pay plaintiff the fair rental value of that property for the period involved. United States v. General Motors Corp., 323 U.S. 373, 382, 65 S.Ct. 357, 89 L.Ed. 311 (1945); Kimball Laundry Co. v. United States, 338 U.S. 1, 7, 69 S. Ct. 1434, 93 L.Ed. 1765 (1949); United States v. 40.379 Square Feet of Land, 58 F.Supp. 246, 250–252 (D.C.Mass.1944); Jacobsen v. Superior Court, 192 Cal. 319, 219 P. 986, 29 A.L.R. 1399 (1923). The taking by Massachusetts was a permanent taking of the fee on July 2nd; the occupation by the United States in March began a prior temporary taking which lasted some three months. In the circumstances of this case the two takings must be viewed as separate. Plaintiff has recovered for the permanent taking, but it is also entitled to compensation, i. e. rent, for the previous temporary taking; for that seizure, the Federal Government is liable. Temporary takings are recognized in the law of federal eminent domain. See, e. g., United States v. General Motors Corp., supra; Kimball Laundry Co. v. United States, supra; Eyherabide v. United States, 345 F.2d 565, 170 Ct.Cl. 598 (May 1965).

The plaintiff is entitled to recover the fair rental value of that part of its land which was used and occupied by the United States during the period from March 25, 1957 to July 2, 1957. Judgment is entered to that effect. The amount of recovery will be determined under Rule 47(c).

WHITAKER, Senior Judge (dissenting in part):

I dissent from the opinion of the majority only to this extent: I do not think plaintiff is entitled to recover from the United States for a temporary taking of its property between the date of the condemnation proceedings by the Commonwealth of Massachusetts in July 1957, and March 1957, the time the contractor, employed by the United States, entered upon plaintiff's property, cut trees, bulldozed the land, removed soil, used the land as a dumping ground, and destroyed plaintiff's dam and headgates, thus diverting the course of the water from the Hoosac River away from the canal leading to the tannery. March 1957 is the date of the taking of plaintiff's property by the United States. Plaintiff is entitled to recover the value of the land taken at that time. If this value is greater than the value in July 1957 when the Commonwealth of Massachusetts condemned the land, plaintiff is entitled to recover the difference, but if there was no difference in the value of the land on the two dates, plaintiff is entitled to recover nothing in addition to the amount awarded in the condemnation proceedings instituted by the Commonwealth of Massachusetts.

The taking by the United States was not a temporary one but a permanent one, and, hence, I cannot agree that plaintiff is entitled to the rental value of the land between March and July.

Otherwise, I concur in the opinion of the majority.