The **UNITED STATES** of America

v.

The **FORT SILL APACHE TRIBE OF OKLAHOMA** and the Chiricahua Apache Tribe et al.

Appeal No. 3–72.

United States Court of Claims.

June 20, 1973.

Bennett, J., concurred in part and dissented in part and filed opinion in which Skelton and Nichols, JJ., concurred.

I. S. Weissbrodt, Washington, D. C., attorney of record, for appellees. Weissbrodt & Weissbrodt, Abe W. Weissbrodt, Richmond F. Allan, Ruth W. Duhl, Washington, D. C., of counsel.

A. Donald Mileur, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for appellant. Dean K. Dunsmore, Christopher Smith, Washington, D. C., of counsel.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KUNZIG and BENNETT, Judges.

DURFEE, Senior Judge:

The United States appeals (a) from the final judgment and order of the Indian Claims Commission dated August 25, 1971,[1] in Dockets 30, 30–A, 48 and 48–A, awarding compensation under Section 2, Clause 4, of the Indian Claims Commission Act (60 Stat. 1049) for the forcible taking by the United States of certain lands in southwestern New Mexico and southeastern Arizona to which appellees held aboriginal title and (b) from the order of the Commission dated June 9, 1971,[2] denying the Government's motion to consolidate the four dockets with Docket 182.

This appeal presents three issues: (1) Whether the Commission abused its discretion in denying the Government's motion to consolidate Dockets 30, 30–A, 48, 48–A and 182; (2) Whether substantial evidence supports the Commission's holding that the date of extinguishment of appellees' aboriginal title was September 4, 1886; and (3) Whether the Commission erred in valuing appellees' mineral interests taken on the basis of capitalized anticipated net profits from mining enterprises rather than on the basis of capitalized hypothetical royalty payments.

We affirm.

1. 26 Ind.Cl.Comm. 198–199.

2. 25 Ind.Cl.Comm. 382–383.

## FIRST ISSUE

The first petition, Docket No. 30, in these cases was filed by the Fort Sill Apache Tribe of Oklahoma claiming to be composed of descendants of the "Warm Springs and Chiricahua Bands of Apache Indians." The second petition, Docket No. 48, was filed by individuals on the Mescalero Reservation in New Mexico, alleging to represent the "Chiricahua and Warm Springs Tribes of Apache Indians."

By order of July 1962, the Commission consolidated Dockets 30 and 48 for trial because it appeared that the subject matter and real parties in interest were the same. Trial in these consolidated cases was held in December 1962 on the issues of the extent and boundaries of the Indian title and the date of the taking.

In another case not here involved the Navajo Tribe had made a claim of aboriginal title to an area which in part overlapped the northern portion of the area claimed in Dockets 30 and 48. After requested findings and briefs on the issues of Indian title and the taking date had been filed in consolidated Dockets 30 and 48, the Commission, on motion of appellees and without objection by the United States, entered an order in January 1968, severing from the consolidated cases the portion of the area which was claimed solely by appellees. This severed claim was assigned consolidated Docket Nos. 30–A and 48–A. This left in Docket Nos. 30 and 48 the claim to the tract to which the Navajo Tribe was asserting a conflicting claim.

In June 1968, the Commission issued its findings, opinion and interlocutory order in Docket Nos. 30–A and 48–A. The Commission determined the boundaries of the land there involved to which appellees held aboriginal title and held

that the land had been taken by the United States on September 4, 1886, without payment of compensation. 19 Ind.Cl.Comm. 212–268. In April 1970, the Commission issued its findings, opinion and interlocutory order in Dockets 30 and 48, segregating the land to which appellees held aboriginal title from the Navajo lands and likewise determining the date of taking to be September 4, 1886. 22 Ind.Cl.Comm. 527–545.

After Docket Nos. 30–A and 48–A had proceeded to trial in January 1970 on the valuation of the land as of the 1886 taking date and the matter was pending determination by the Commission, the Government on June 4, 1970 filed a motion for rehearing the determination made in June 1968 that September 4, 1886 was the date of taking. In August 1970, the Commission issued an "Order Denying Defendant's 'Motion for Rehearing and Reconsideration of Date of Taking'" on three grounds, ruling that the motion was not timely filed, that defendant had failed to state any valid grounds for rehearing under the Commission's Rules of Procedure or applicable decisions, and that the Commission's findings with respect to the 1886 date of taking were supported by substantial evidence. 23 Ind.Cl.Comm. 417–418.

After both parties had filed their requested findings and briefs on the valuation issues in Dockets 30–A and 48–A and the matter was still awaiting the Commission's decision, on March 10, 1971 [3] the Government filed a " * * * Motion to Consolidate * * *" the two groups of dockets (30–A, 48–A and 30, 48) with a fifth case, Docket No. 182. The Fort Sill Apaches and individual associated Indians had filed the petition in Docket No. 182. Alleging the same aboriginal title boundaries as in Docket No. 30, those petitioners sought *inter alia* to hold the United States liable for

---

3. The status of Dockets 30 and 48 at this time was as follows: In order to avoid a valuation trial, on September 4, 1970, by stipulation the parties agreed that the tract of land involved in Docket Nos. 30 and 48 embraced 804,000 acres and agreed

that the per acre fair market value of this tract would be the same as the per acre value of the surface tract involved in Dockets 30–A and 48–A which was pending determination by the Commission.

alleged "trespass damages" prior to the date of extinguishment of aboriginal title.

In its " * * * Motion To Consolidate * * * " the Government reasoned that all five dockets constituted essentially one claim, arguing that the Indians involved were entitled to be compensated only once for the extinguishment of their aboriginal title. In its motion to consolidate the Government concluded: "Accordingly, the cases alleging the extinguishment of aboriginal title and Docket No. 182 should be consolidated in order that, if necessary, the date of extinguishment should be moved back. * * * "

In its order denying the Government's " * * * Motion to Consolidate * * * ", 25 Ind.Cl.Comm. 382–83 (1971), the Commission viewed the motion in part as a second motion for rehearing to "determine a new date of taking applicable to all five cases." As grounds for rejecting the " * * * Motion to Consolidate * * * " the Commission separately cited its "Order Denying Defendant's 'Motion for Rehearing and Reconsideration of Date of Taking' " in Dockets 30–A and 48–A and the Commission's decision in the case of Washoe Tribe v. United States, 21 Ind. Cl.Comm. 447 (1969). In Washoe the Commission held the Government liable on two claims, essentially recognizing as separate one claim under Section 2, Clause 4, of the Indian Claims Commission Act (60 Stat. 1049) for the taking of aboriginal title lands and another claim under Section 2, Clause 5, of the Act for "trespass damages" prior to the time of extinguishment of title.

■ The Commission's Rules of Procedure provided that leave of the Commission was required before the same party could file a second motion for rehearing.[4] The United States failed to comply with this rule. The Commission did not abuse its discretion in treating the " * * * Motion to Consolidate * * * " in part as a motion for rehearing. The United States sought "further litigation" in its motion to consolidate on the identical issue, i.e., the date of taking, as it sought in its first motion for rehearing.

Although the " * * * Motion to Consolidate * * * " cannot be said to have been filed too late since neither the June 28, 1968 opinion and order (in Dockets 30–A and 48–A) nor the April 1, 1970 opinion and order (in Dockets 30 and 48) were a "final determination"[5] commencing the period for filing,[6] we do not read the Commission's order denying the " * * * Motion to Consolidate * * * " as being grounded on untimeliness.

■ Moreover, the Commission did not abuse its discretion in denying the " * * * Motion to Consolidate * * * " based upon its Washoe decision. That decision recognized the distinctness of a claim for the taking of Indian lands without compensation and a claim for damages to Indian lands prior to the taking. This distinction went to the heart of the Government's claim that the five dockets involved only one claim.

In affirming the order of the Commission denying the " * * * Motion to Consolidate * * * ", we do not pass upon the merits of the Washoe decision and merely hold that the Commission

4. Rule 33(a): "Whenever either party desires to question the correctness or the sufficiency of the Commission's conclusions on its findings of fact or to amend the same, the complaining party shall file a motion which shall be known as a motion for rehearing. * * * After the Commission has announced its decision upon such motion no other motion for a rehearing shall be filed by the same party unless by leave of the Commission. Motions for a rehearing shall be filed within 30 days from the time the final determination of the Commission is filed with the Clerk." 25 C.F.R. § 503.33(a) (1971). This rule governed during all pertinent times.

5. Ibid.

6. Seminole Indians of the State of Florida v. United States, 471 F.2d 614, 200 Ct. Cl. —— (1973).

did not abuse its discretion in relying upon one of its own decisions on point. The correctness of the *Washoe* decision is not an issue here.

## SECOND ISSUE

The Commission, referring to appellees collectively as the "Chiricahua Apaches", found in consolidated Dockets 30–A and 48–A that: *"September 4, 1886,* the date of the final surrender of the Chiricahua Apaches under Geronimo and the time of the removal of the members of the tribe from their homelands, marks the date on which the United States took from the Chiricahua Apache tribe its Indian title to its lands in New Mexico and Arizona. \* \* \*" 19 Ind. Cl.Comm. 212, 245 (1968). In Dockets 30 and 48 the Commission concluded: "The *Fort Sill* record [Dockets 30–A and 48–A] is the record in this proceeding, with the addition of that evidence offered by the Navajos in Docket No. 229. In like manner, the date of taking in the *Fort Sill* case, September 4, 1886, applies herein with respect to the extinguishment by the United States of whatever interest the Apaches may have enjoyed in the overlap area." 22 Ind.Cl.Comm. 527, 529 (1970).

Were we to rule upon the merits of appellant's claim that the date of taking is not supported by substantial evidence; we might agree on the present record. The record could be said to establish that Indian title was extinguished before September 4, 1886, when the Act of August 15, 1876, 19 Stat. 176, 195, was passed. Congress may extinguish Indian title by a "clear and plain indication" in the public records that the sovereign "intended to extinguish all of the [claimants'] rights" in their property. United States v. Santa Fe Pac. R. R. Co., 314 U.S. 339, 353, 62 S.Ct. 248, 255, 86 L.

Ed. 260 (1941); Lipan Apache Tribe v. United States, 180 Ct.Cl. 487, 492 (1967). *See* Tlingit & Haida Indians v. United States, 177 F.Supp. 452, 147 Ct.Cl. 315 (1959); Three Affiliated Tribes of the Fort Berthold Reservation v. United States, 390 F.2d 686, 182 Ct.Cl. 543 (1968); Klamath & Modoc Tribes v. United States, 436 F.2d 1008, 193 Ct.Cl. 670 (1971). The Act, applying to the "Apaches of Arizona and New Mexico", commanded that the "Commissioner of Indian Affairs shall direct that said Indians shall not be allowed to leave their proper reservations", the effect of which was intended to confine the ancestors of appellees to a reservation wholly outside the aboriginal title area.[7]

■ However, we hold that the Government's conduct of the litigation in these dockets amounts to a waiver of the right to challenge the September 4, 1886 taking date.

In December 1962, at the outset of the only trial held in these four dockets before the Commission on the taking issue, petitioners' counsel clearly stated one of the "main issues" to be "the date or dates of the taking of the Indian title lands by the defendant."[8] An eight-day trial followed.

In January 1964, the petitioners (appellees) submitted their proposed findings of fact and brief on the issues of title and taking. In Proposed Finding Nos. 88, 89 and 90 petitioners marshalled the facts in their favor to suggest September 4, 1886 as the date of taking and specifically proposed September 4, 1886 as the date of taking in Proposed Finding No. 90. Petitioners argued the facts in their brief and provided supporting legal authority on the taking issue.

In its Proposed Findings of Fact, Objections to Petitioners' Proposed

---

7. By May of 1877 the only officially recognized home for appellees was the San Carlos Reservation. The Commission found: "[I]n 1876, the Government embarked on a program of moving all Chiricahua Apaches from their ancestral home-lands and settling them on the San Carlos Reservation located outside their home-lands." 19 Ind.Cl.Comm. 212, 229.

8. Transcript Docket Nos. 30 and 48, December 11, 1962, p. 29.

Findings of Fact, and Brief on the issues of title and taking filed in May 1964, defendant-appellant proposed no finding of fact on the date of taking despite a then existing Commission rule requiring the same.[9] Other than a bald objection to petitioners' Proposed Finding No. 90, defendant-appellant chose not to argue for an alternative taking date and ignored the issue in its brief. Both at the trial and in its proposed findings and brief, the Government relied instead upon defenses that the petitioners never had aboriginal title and that the Apaches in the claimed area did not constitute a single tribe or band with a cognizable claim. The posture of the case at that time with respect to the taking date issue is best reflected in a footnote to Petitioners' Reply to Defendant's Proposed Findings of Fact, Objections and Brief: "Although defendant objects to petitioners' proposed taking date of September 4, 1886 (Pet.Fdg. 90, pp. 85–88), it presents no evidence to contradict the facts upon which this taking date is predicated (Def.Obj. 90, pp. 75–76). Defendant also offers no answer to petitioners' discussion of the legal authorities which support petitioners' 1886 taking date in the circumstances of this case (Pet.Br., pp. 94–98). Further discussion of the taking date in this reply is therefore considered unnecessary."[10]

After the Commission issued its findings, opinion and interlocutory order in consolidated Dockets 30–A and 48–A in June 1968 on the issues of aboriginal title and date of taking defendant-appellant did not challenge the date of taking

finding. Defendant-appellant continued to remain silent between June 1968 and April 1970 when the Commission issued its findings, opinion and interlocutory order in Dockets 30 and 48, again finding a taking date of September 4, 1886. And at the intervening and costly [11] valuation trial in Dockets 30–A and 48–A in January 1970, not once did the Government express objection to the taking date.[12] It was not until defendant-appellant's rejected " * * * Motion to Consolidate * * * " filed March 10, 1971, that the Government *for the first time* proposed a *specific* alternative date of extinguishment of title.

In short, in the proceedings below at no time did defendant-appellant properly propose its alternative theories of the date of taking when the issue was pending before the Commission and seek to convince the Commission that the weight of the evidence in the record supported one or another of such theories. Likewise, at no time did defendant-appellant actively and properly oppose the taking date proposed by petitioners and found by the Commission. As we said in Suquamish Tribe v. United States, 197 Ct. Cl. 775, 777 (1972):

"[T]hese matters should have been presented to the fact-finding tribunal; no adequate excuse is offered for the failure to do so. * * * In § 20(b) of the Act, 25 U.S.C. § 70s, Congress made it clear that, in cases coming from the Commission, we were to be an appellate or reviewing court, not a court of first instance. From the beginning, we have followed that concept, refusing to treat appeals as

---

9. 25 U.S.C. § 70h gives to the Commission the power to establish its own rules of procedure. Pursuant to this authority, the Commission promulgated the following rule which governed the Commission's proceedings during all pertinent times: "§ 503.28 Briefs—

* * * * *

(b) *Defendant.* Within 40 days from the filing of petitioner's brief (or if none has been filed within the time on which it should have been filed under paragraph (a)(1) of this section) the defendant

shall file with the Clerk 25 printed copies of its request for findings of fact and brief * * *." 25 C.F.R. § 503.28 (1958).

10. Filed May 3, 1965; p. 3, n. 1.

11. Appellees note in their brief that the cost to them of the valuation trial, including fees to the appraisers, was in excess of $100,000.

12. In fact it appears that the Government thought the 1886 date was a much better date from its standpoint than a date three or four years earlier.

trials *de novo* or to consider the proceedings before the Commission as mere preliminaries to a 'real trial' here. (Citations omitted.)"

Reviewing courts have developed various rules governing appealable issues under the rubric of waiver which have been described as "positive rules of procedure based on manifest justice and, to a greater or less degree, on considerations of the orderliness, regularity, and expedition of litigation."[13] Reviewing courts will normally only consider questions raised and reserved in the lower court [14] and will not consider grounds of defense or opposition not asserted and relied on below.[15] The right to raise a particular matter on appeal may be waived by conduct indicating an intention not to insist upon the matter.[16] While there are no decisions of this court dealing with the precise situation presented on this appeal, the cumulative circumstances of this case, wherein appellant repeatedly refused to raise and press the issue of the date of taking compels us to decline review.

■ In analyzing the scope of review of this court, Judge Littleton noted in Osage Nation v. United States, 97 F. Supp. 381, 392, 119 Ct.Cl. 592, 613, cert. denied, 342 U.S. 896, 72 S.Ct. 230, 96 L. Ed. 672 (1951): "It thus appears that it was at the instance of the Department of Justice that this court was ultimately directed to review judicially the findings of fact of the Commission, and the form of review applied to the Commission's findings were those embodied in the Administrative Procedure Act." It goes without saying that the Department of Justice is one of the advocates in every Indian claims case before the Commission and this court. It was fully apprised of the main issues in this case.

Indeed, the issues of liability and date of taking, if any, are among the most basic issues in every land claims case under Section 2, Clause 4, of the Indian Claims Commission Act. Under the circumstances of this case we acknowledge the salutary rule that: "[I]ssues not effectively presented to an administrative agency, where ample opportunity to do so has been afforded, cannot be raised on appeal of that agency's decision." Hennesey v. Securities and Exchange Commission, 285 F.2d 511, 514 (3rd Cir. 1961).

It is just and appropriate to apply this rule to this case because appellees might well have introduced other or additional evidence if they had been alerted that the Government was challenging the 1886 date. Likewise, the Commission might have decided differently if it had been made aware that the 1886 date was in contest. As it was, the entire valuation trial centered on the 1886 date which the Government first disputed after the completion of that trial.

## THIRD ISSUE

Appellant complains that the Commission erred as a matter of law in selecting (for some 60,000 acres of mining properties taken) a valuation method based on the capitalized anticipated net profits from mining enterprises.

■ This valuation method was expressly sanctioned in Tlingit & Haida Indians v. United States, 182 Ct.Cl. 130, 148, 389 F.2d 778, 790 (1968). Although this method is not the only possible way to value mineral interests, it certainly is a permissible method. The Commission did not err as a matter of law in selecting this method.

Affirmed.

---

13. 10 Ruling Case Law, Estoppel § 26, p. 698.

14. United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 36–37, 73 S.Ct. 67, 97 L.Ed. 54 (1952); McGrath v. Manufacturers Trust Co., 338 U.S. 241, 249–250, 70 S.Ct. 4, 94 L.Ed. 31 (1949).

15. Kay v. United States, 303 U.S. 1, 5, 58 S.Ct. 468, 82 L.Ed. 607 (1938).

16. *See* 5 Am.Jur.2d, Appeal & Error, § 710. *See generally* 5 Am.Jur.2d, Appeal & Error, §§ 235 et seq., 545 et seq., and 709 et seq..

BENNETT, Judge, (concurring in part and dissenting in part):

I concur with that portion of the majority opinion which holds that the Indian Claims Commission did not abuse its discretion in denying the defendant-appellant's motion to consolidate all five dockets discussed in the opinion. I agree, also, that in so holding we do not pass on the correctness of the principles enunciated by the Commission in Washoe Tribe v. United States, 21 Ind.Cl. Comm. 447 (1969), a case which was not appealed to this court. The troublesome issue of whether Indians are entitled to trespass damages prior to the date of extinguishment of aboriginal title is not in proper posture for our consideration at this time. We will doubtless have to face this later because these particular Indians claim over $20,000,000 additional for such trespass. I respectfully dissent from the court's resolution of the other two issues in the instant case.

The majority has agreed with the Commission that September 4, 1886, the date of the final surrender of the Chiricahua Apaches, who at the time were under leadership of Geronimo in Mexico, marks the date of taking of the Chiricahua lands in New Mexico and Arizona. The majority, however, states:

Were we to rule upon the merits of appellant's claim that the date of taking is not supported by substantial evidence, we might agree on the present record. The record could be said to establish that Indian title was extinguished before September 4, 1886, when the Act of August 15, 1876, 19 Stat. 176, 195, was passed. Congress may extinguish Indian title by a "clear and plain indication" in the public records that the sovereign "intended to extinguish all of the [claimants'] rights" in their property. [Citations omitted.] The Act, applying to the "Apaches of Arizona and New Mexico", commanded that the "Commissioner of Indian Affairs shall direct that said Indians shall not be allowed to leave their proper reserva-tions", the effect of which was intended to confine the ancestors of appellees to a reservation wholly outside the aboriginal title area. [Footnote omitted.]

Without belaboring the point, the record is clear that the 1886 date is indeed unrealistic because when Geronimo surrendered he wasn't even in the United States occupying the claimed lands and, had he been, his small band of 38 Indians, 24 men and 14 women and children, who surrendered, could hardly, in all reason, be said to have been maintaining exclusive use and control over 15,-606,387 acres of claimed aboriginal lands. To the contrary, the Commission discloses that in 1886 there were 26,000 white settlers on the lands with their numerous towns and settlements, and the area was traversed by two railroads and telegraph facilities. There were 425,000 head of cattle grazing on the subject tract. Further, the petition in Docket No. 30 alleged that Congress, by the Act of July 22, 1854, 10 Stat. 308, and other acts, opened the Chiricahua lands to homesteading, settlement, and pre-emption. The petition in Docket No. 182 (which was not consolidated here) demanded an accounting back to February 2, 1848. Appellant here contends that the taking could have been no later than 1872 when, as a physical fact, the Chiricahua Apaches no longer had exclusive and continuous use and control of their aboriginal title area, and, as a matter of official Government policy, were confined to reservations, which policy was enforced by the United States Army and a special Indian police force, thus extinguishing Indian title under the authority of statute, executive action, and cases cited in appellant's briefs. It would also appear that there might be several different dates of taking for so many millions of acres because the various Indian bands were directed onto reservations at different times. Further, miners, ranchers and farmers are shown to have had possession of the Indian lands at various early dates, thus negating the exclusive use,

control and possession necessary to sustain aboriginal title in claimants in 1886. So, it is with very good reason that the majority says that on the present record it might have to agree that the 1886 date of taking found by the Commission is unsupported by substantial evidence. That is probably the understatement of this term of court.

Whatever the correct date of taking might be, however, the majority holds that the appellant has waived any challenge to September 4, 1886, as the date of taking. Appellant took a big gamble at the trial, and in submission of proposed findings, by arguing that there was no taking because there was no title to take and that the Apaches in the claimed area did not constitute a single tribe or band with a cognizable claim. Presumably, the Government thought its legal position would be weakened by contending for an alternate date to 1886, relied upon by claimants. Hindsight suggests that this was a tactical error, for a judgment against the Government in the net sum of $16,489,096 resulted, 26 Ind.Cl.Comm. 193, 198 (1971), and is now affirmed by the majority opinion. On June 4, 1970, the Government filed a motion for a rehearing and reconsideration of the valuation date. The motion was denied on August 26, 1970. Appellant then, on March 10, 1971, after rejection of its motion to consolidate, for the first time proposed a specific alternate date of title extinguishment.

It is an unhappy situation which now brings this case to us on appeal after trial and rejection of the Government's legal defense and where now, on a technicality of waiver, the majority says that a judgment exceeding 16 million dollars must be affirmed, although at the same time saying it is probably not based on substantial evidence. Indeed, the decision of the Commission is clearly wrong on the date of taking, and the majority does not say one word to defend this error but, on the other hand, points it up. It is wrong on the facts and it is not supported by substantial

evidence, although the appellant did not contest it when this could most conveniently have been done. The decision as to the date is also wrong as a matter of law because the Act of August 15, 1876, if not earlier acts, directed that the Indians be confined to reservations outside their alleged aboriginal lands and, thus, deprived them of those lands. This issue should be remanded to the Commission for development of an appropriate record on the date or dates of taking and new findings thereon pursuant to the correct rule of law, namely, extinguishment of title by intent of Congress in establishing reservations, appropriating money, and loss by the Indians of exclusive control and possession of their aboriginal lands. It is a travesty of justice when the court admits that the date is probably wrong and that the record suggests it is not supported by substantial evidence, and 16 million dollars is riding on such error.

As authority for this harsh rule against the sovereign, which has generously consented to be sued, the majority opinion cites a Third Circuit case, Hennesey v. Securities & Exch. Comm'n, 285 F.2d 511 (3d Cir. 1961). An examination of that case shows that it deals with a different situation. There, *Hennesey*, a minority stockholder, was granted leave to seek review of an SEC order which had followed an extensive administrative hearing and a decision entered after a trial of 27 days over a period of 8 months. *Hennesey* had been granted permission to participate in those hearings but did not appear nor file exceptions or briefs before the hearing examiner, or before the Commission. The court properly held that *Hennesey* had not exhausted administrative remedies and cited section 43(a) of the Investment Company Act of 1940, 54 Stat. 844, 15 U.S.C. § 80a–42(a), which provided:

\* \* \* No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Com-

mission *or unless there were reasonable grounds for failure to do so.* * * * . [Emphasis supplied.]

The court also cited the Commission's Rules of Practice which required that a party preserve objections to an intermediate decision by exceptions.

It is clear that *Hennesey,* unlike appellant here, was not standing on legal grounds but simply defaulted, without any reasonable grounds for such failure. Appellant here raised its point late, but before the case got to this court. What the majority is really saying is that it is helpless because "there are no decisions of this court dealing with the precise situation presented on this appeal." I respectfully refer, as an example to the contrary, to the case of Volentine & Littleton v. United States, 145 F.Supp. 952, 136 Ct.Cl. 638 (1956), where the Government counsel, standing on finality of an administrative decision, declined to offer evidence at a trial before a commissioner of the court, but the court concluded that he should have done so and said:

> * * * we shall not foreclose it [the Government] from now introducing evidence, if it wishes to do so. It was seeking to obtain a decision on an important legal question and we will not penalize it for having done so. The case is remanded to the commissioner of this court, who will proceed with it in the regular course. [145 F.Supp. at 954–955, 136 Ct.Cl. at 643.]

This court, in its desire to get at the true facts of a case, has not, historically, been hesitant to remand a case for the taking of further evidence before a final judgment. It should not be hesitant now to follow its own precedent, to exercise its discretion, and to send this case back on the issue of the date or dates of taking and damages therefrom. The Indians are entitled to just compensation for the taking, but the Government is entitled to the considered judgment of the court that the date or dates of taking, and the compensation therefor, are factually and legally correct and not based on some procedural technicality or excessive legalism lawyers can appreciate better than the taxpayers to whom an error is an error, and who must foot the bill. The court has not been so strict when the Indians misapprehended what they should have proved. A remand was ordered to give them opportunity to offer further proof in Confederated Salish & Kootenai Tribes v. United States, 189 Ct.Cl. 319, 417 F.2d 1340 (1969). Can we be less fair now? Are we to countenance a judicial double standard of justice? All appellant seeks is to receive fair and honorable treatment. Is it to be a one-way street in this court for Indians only?

The majority opinion is not only based on a finding wrong in fact and law as to the date or dates of taking, but there is grave question about the method of valuation used by the Commission, and which the court affirms, as to mineral lands within the claimed area. The court doesn't defend the method of valuation very strongly, just as it cannot defend the date of taking. It simply says that it is a "permissible method" and was sanctioned in Tlingit & Haida Indians v. United States, 389 F.2d 778, 790, 182 Ct.Cl. 130, 148 (1968). I dissent, also, from this complacent treatment of a vital issue involving a multi-million-dollar judgment.

There are some 61 mining properties at issue here, involving about 60,000 acres. The highest and best use of the acreage is agreed to be for mineral production. Expert witnesses were employed by the litigants and, to a large extent, based fair market value of the properties on a capitalization of income which could reasonably have been anticipated therefrom as of September 4, 1886. Appellee's expert rejected the use of comparable sales and relied upon capitalization of future profits it was assumed a mining entrepreneur would make from production from an existing mine or prospective profits from a potential mineral area. This was equated by him to total fair market value of a mine as a business operation. Appel-

lant's expert applied his valuation largely to a royalty which a landowner would have received and used sales data where available. When neither reliable production statistics nor a sales price was at hand, appellant's expert used a "comparability and interpretation" method where general appraisal factors used in other districts of the region were compared and interpreted. Appellant's expert valued the 60,000 acres as worth $3,023,265 while appellee's expert valued the mineral lands to be worth $10,763,478 in 1886. The Commission's valuation was $6,375,000.

The Commission agreed that it is common practice for a landowner to lease mineral properties for a royalty but rejected this method of valuation in favor of one giving the Indians the entire profits from a mining enterprise although the Chiricahua Apaches of the 19th century had no more mining expertise than the ordinary farmer on whose lands minerals were found. This is a rather startling proposition, one I never encountered in my 23 years as a trial judge, hearing many valuation cases. A passive fee owner is certainly entitled to the fair market value of his property as just compensation for its taking, but under the weight of authority this does not include damages represented by loss of anticipated profits from business which might be conducted on the property by an astute businessman with experience and technical skills. Mitchell v. United States, 267 U.S. 341, 45 S.Ct. 293, 69 L. Ed. 644 (1925); Joslin Mfg. Co. v. Providence, 262 U.S. 668, 675, 43 S.Ct. 684, 67 L.Ed. 1167 (1923); Mosca v. United States, 417 F.2d 1382, 1386, 189 Ct.Cl. 283, 290 (1969), cert denied, 399 U.S. 911, 90 S.Ct. 2197, 26 L.Ed.2d 565 (1970); and R. J. Widen Co. v. United States, 357 F.2d 988, 994, 174 Ct.Cl. 1020, 1029 (1966).

Fair market value may be enhanced by known mineral deposits and, absent comparable sales, it may be necessary to use a capitalization-of-income approach, although capitalization is an inaccurate method usually resorted to only when all else fails. In any event, conjectural business profits from mining would not be capitalized in preference to the royalty value of the land, by the weight of authority. United States v. Land in Dry Bed of Rosamond Lake, Cal., 143 F.Supp. 314, 318 (S.D.Cal.1956); cf. United States v. Whitehurst, 337 F.2d 765, 772–773 (4th Cir. 1964); United States v. 158.76 Acres of Land, 298 F.2d 559 (2d Cir. 1962); and United States v. Silver Queen Mining Co., 285 F.2d 506 (10th Cir. 1960). It is just not reasonable, nor is it just compensation, that passive, primitive landowners, such as appellees, should reap all the hypothetical profits that could be made out of minerals which only expert mining engineers could discover, mine, mill and ship to market, using much capital, labor, and know-how. The mines which accounted for much of the production noted by the experts were large, extensively developed, highly capitalized and sophisticated enterprises. The Commission's rule leaves no incentive to the mining company or the oil company which must put up risk capital to explore and extract, and does so not for the benefit of the landowner but for profit to itself. The Commission's rule affirmed by the court, if widely adopted, would produce an energy crisis worse than the one we read about today, Exxon and its competitors are not the charitable enterprises the majority would make of the Government. Of course, it can safely be assumed, no one would ever apply such an unconventional rule to any but Indian cases. Yet, if we are to equate the landowner and the entrepreneur by eliminating profits to the latter in this case, it must be on clearer authority than the court's decision in Tlingit & Haida Indians v. United States, *supra*, which the Commission relies upon, but misreads, and the majority opinion glosses over in three short sentences, without discussion. That case involved several issues with which we are not concerned here, and it was prosecuted under a special jurisdictional act, not the Indian Claims Commission Act on which the in-

stant claim is predicated. However, it did involve a claim for certain gold mines and mineral lands by Indians in Alaska. As to that part of the claim, the court said, in pertinent part:

· The value of land includes the fair market value of its mineral content. [Citation omitted.] Mineral value is established by adequate proof of a fair market value indicating that removal of the deposit would be a profitable venture and would not involve exorbitant expense.

Proof either of actual profits from an existing mine or of prospective profits from a potential mineral area establishes the mineral value of the area. The valuation data amassed and the testimony offered by plaintiffs do not establish the required factual proof of the mineral area's prospective profitability which could be translated into a market value for the mineral deposit. Those factors to which a court looks in ascertaining value, which are not proved probable, remain mere speculation and may not be the basis for valuing property. [Citations omitted.]

After consideration of the speculative nature of the mining venture in unexplored mining areas, the absence of any existing production in the area, the cost of development and the removal and transportation of the minerals, the trial commissioner found that the prospective profitability of the venture was not established. In the absence of proof that the venture would be profitable, no fair market value can be found.

\*   \*   \*   \*   \*   \*

Plaintiffs proved the value of mined mineral in those areas for which compensation was awarded, by proof of the value of the ore as a removed and processed commodity. This established that removal was profitable and the fair market value based on the known value of the mineral deposit was determined. \*  \*  \*. [389 F. 2d at 790, 182 Ct.Cl. at 148–149.]

It is clear from the above that the court did not say that only profits could be used in determining the fair market value of mineral property. It allowed them where not speculative, but was unable to make an award based on prospective profits from undeveloped areas because they were speculative. The court did not equate the landowner and the mining entrepreneur nor eliminate, as the Commission has done, other methods of valuation. The Commission jumped to the wrong conclusion when it determined that this court has approved only capitalization of anticipated future profits as the most probative of valuation methods for mineral lands. The language in *Tlingit & Haida* is broad, too broad perhaps, and susceptible to misinterpretation. The Commission has misread the case for it does not favor capitalization of future speculative profits over capitalization of a royalty to the landowner. The opinion does not discuss this more generally accepted alternative valuation method on which proof was apparently not offered, as it was here. The capitalized profits projected by the Commission are too speculative. They are based on conclusory findings of prospective profitability on unidentified tracts. Only half a dozen mining districts are described out of a total of 61. These cursory findings do not meet the *Tlingit & Haida* test and should be rejected in favor of a more realistic valuation, even granting the implied thesis of that case that Indians are entitled to a more favorable valuation method than other claimants. The court cannot find the facts about this, but must observe the findings before us to have been based on a mistaken view of the law of valuation even as expanded by the single case relied on by the majority.

In his dissent in *Tlingit & Haida*, Judge Nichols observed, as to the gold mine claims, that it is contrary to most precedent to make a lawful taker pay for an improvement it has itself installed in good faith. He said that it is wrong to base an award on estimates of the unmined minerals in place because this is

too speculative. He cited with approval the Commission's holding in Winnebago Tribe v. United States, 16 Ind.Cl.Comm. 81 (1965), wherein the Commission refused to make a fact-finding speculating on possible profits, after the taking date, from the minerals involved. He said:

As a practical matter, the original proprietors of the soil, however well protected by law and skillfully represented, could not have expected to pocket all or most of the profits from mining on their lands. It is common knowledge that the party who has the capital, the equipment, the know-how, and the access to markets, will always take the lion's share. The commissioner's method of valuation here donates these things to the Indians. [389 F.2d at 793, 182 Ct.Cl. at 153–154.]

Had I been a member of the court at the time and participated in the decision in *Tlingit & Haida*, I would have agreed with Judge Nichols' dissent in this case which he has elsewhere described as producing an absurdity, paying the Indians for gold mines they never had. That is what the majority does here for copper and silver mines. Yet, it is not necessary to reverse *Tlingit & Haida* to reach a proper result here. It is respectfully submitted that the majority should recognize this and not give *Tlingit & Haida* the restricted meaning attributed to it by the Commission (but not heretofore by the court), which, rejecting all prior precedent, professes an ability to anticipate profits from potential mineral areas and hands them over to claimants who did not earn them, and from whom they were not taken. If the valuation method used by the Commission is sometimes, as the majority says, "permissible," I would say that it is impermissible in the instant case where both its application and result are distorted. *Tlingit & Haida* teaches that the method it allows should not be employed where the results would be speculative. That

fits this case like a glove. I would reverse and remand.

SKELTON and NICHOLS, Judges, join in the foregoing concurring and dissenting opinion.